# WASHINGTON ET AL. *v.* CONFEDERATED BANDS AND TRIBES OF THE YAKIMA INDIAN NATION

No. 77–388.   Argued October 2, 1978—Decided January 16, 1979

464

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 502.

*Slade Gorton*, Attorney General of Washington, argued the cause for appellants. With him on the briefs were *Malachy R. Murphy*, Deputy Attorney General, and *Jeffrey C. Sullivan*.

*James B. Hovis* argued the cause and filed a brief for appellee.

*Louis F. Claiborne* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Peter R. Steenland, Jr., Carl Strass*, and *Neil T. Proto.*[*]

MR. JUSTICE STEWART delivered the opinion of the Court.

In this case we are called upon to resolve a dispute between the State of Washington and the Yakima Indian Nation over the validity of the State's exercise of jurisdiction on the Yakima Reservation. In 1963 the Washington Legislature obligated the State to assume civil and criminal jurisdiction over Indians and Indian territory within the State, subject only to the condition that in all but eight subject-matter areas jurisdiction would not extend to Indians on trust or restricted lands without the request of the Indian tribe affected. Ch. 36, 1963 Wash. Laws.[1] The Yakima Nation

---

[*]*Michael Taylor, Robert L. Pirtle*, and *Robert D. Dellwo* filed a brief for the Confederated Tribes of the Colville Reservation et al. as *amici curiae*.

[1] The statute, codified as Wash. Rev. Code § 37.12.010 (1976), provides:

"Assumption of criminal and civil jurisdiction by state. The State of Washington hereby obligates and binds itself to assume criminal and civil

did not make such a request. State authority over Indians within the Yakima Reservation was thus made by Chapter 36 to depend on the title status of the property on which the offense or transaction occurred and upon the nature of the subject matter.

The Yakima Nation brought this action in a Federal District Court challenging the statutory and constitutional validity of the State's partial assertion of jurisdiction on its Reservation. The Tribe contended that the federal statute upon which the State based its authority to assume jurisdiction over the Reservation, Pub. L. 280,[2] imposed certain procedural requirements, with which the State had not complied—most notably, a requirement that Washington first amend its own constitution—and that in any event Pub. L. 280 did not

---

jurisdiction over Indians and Indian territory, reservations, country, and lands within this state in accordance with the consent of the United States given by the act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session), but such assumption of jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States, unless the provisions of R. C. W. 37.12.021 [tribal consent] have been invoked, except for the following:

"(1) Compulsory school attendance;
"(2) Public assistance;
"(3) Domestic relations;
"(4) Mental illness;
"(5) Juvenile delinquency;
"(6) Adoption proceedings;
"(7) Dependent children; and
"(8) Operation of moter vehicles upon the public streets, alleys, roads and highways: *Provided further*, That Indian tribes that petitioned for, were granted and became subject to state jurisdiction pursuant to this chapter on or before March 13, 1963 shall remain subject to state civil and criminal jurisdiction as if chapter 36, Laws of 1963 had not been enacted."

The statute will be referred to in this opinion as Chapter 36.

[2] Act of Aug. 15, 1953, 67 Stat. 588–590. For the full text of the Act, see n. 9, *infra*.

authorize the State to assert only partial jurisdiction within an Indian reservation. Finally, the Tribe contended that Chapter 36, even if authorized by Congress, violated the equal protection and due process guarantees of the Fourteenth Amendment.

The District Court rejected both the statutory and constitutional claims and entered judgment for the State.[3]  On appeal, the contention that Washington's assumption of only partial jurisdiction was not authorized by Congress was rejected by the Court of Appeals for the Ninth Circuit, sitting en banc. The en banc court then referred the case to the original panel for consideration of the remaining issues. *Confederated Bands and Tribes of the Yakima Indian Nation* v. *Washington,* 550 F. 2d 443 (*Yakima I*).[4]  The three-judge

---

[3] The complaint also contained other claims that were decided adversely to the plaintiff by the District Court. After extensive discovery and the entry of a pretrial order, the District Court granted partial summary judgment in favor of the State on several of these claims. On the question of compliance with Pub. L. 280, the District Court held that it was bound by the decision of the Court of Appeals for the Ninth Circuit in *Quinault Tribe of Indians* v. *Gallagher,* 368 F. 2d 648, 655–658, which had determined that the State of Washington could accept jurisdiction under Pub. L. 280 without first amending its constitution and that Washington's jurisdictional arrangement did not constitute an unauthorized partial assumption of jurisdiction. The District Court also rejected the claim that Chapter 36 was facially invalid under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The question of the constitutional validity of Chapter 36 as applied to the Yakima Reservation was reserved for a hearing and factual determination. After a one-week trial, the District Court found that the appellee had not proved "that the state or county have discriminated . . . to deprive any Indian or the plaintiff Tribe of any service or protection, resource or asset afforded under the same state law to other citizens or similar geographic location." The complaint was then dismissed.

The opinion of the District Court is unreported.

[4] The en banc hearing was ordered by the Court of Appeals *sua sponte* after the original panel had heard argument. This hearing was limited to the question whether that court's earlier partial-jurisdiction holding in

panel, confining itself to consideration of the constitutional validity of Chapter 36, concluded that the "checkerboard" jurisdictional system it produced was without any rational foundation and therefore violative of the Equal Protection Clause of the Fourteenth Amendment. Finding no basis upon which to sever the offending portion of the legislation, the appellate court declared Chapter 36 unconstitutional in its entirety, and reversed the judgment of the District Court. *Confederated Bands and Tribes of the Yakima Indian Nation v. Washington*, 552 F. 2d 1332 (*Yakima II*).

The State then brought an appeal to this Court. In noting probable jurisdiction of the appeal, we requested the parties to address the issue whether the partial geographic and subject-matter jurisdiction ordained by Chapter 36 is authorized by federal law, as well as the Equal Protection Clause issue. 435 U. S. 903.[5]

---

*Quinault Tribe of Indians* v. *Gallagher, supra,* should be overruled. A majority of the en banc panel agreed with the result in *Quinault,* finding no statutory impediment to the assumption of partial geographic and subject-matter jurisdiction. 550 F. 2d, at 448. Five judges dissented. *Id.,* at 449.

[5] The three-judge appellate court's equal protection decision was based upon the disparity created by Chapter 36 in making criminal jurisdiction over Indians depend upon whether the alleged offense occurred on fee or nonfee land. 552 F. 2d, at 1334–1335. The court found this criterion for the exercise of state criminal jurisdiction facially unconstitutional. The appellate court found it unnecessary, therefore, to reach the Tribe's contention that the eight statutory categories of subject-matter jurisdiction are vague or its further contention that the *application* of Chapter 36 deprived it of equal protection of the laws. 552 F. 2d, at 1334.

In its motion to affirm, filed here in response to the appellants' jurisdictional statement, the Yakima Nation invoked in support of the judgment "each and every one" of the contentions it had made in the District Court and Court of Appeals, but limited its discussion to the equal protection rationale relied upon by the appellate court. In its brief on the merits the Tribe has addressed—in addition to those subjects implicit in our order noting probable jurisdiction, see n. 20, *infra,* one issue that merits brief discussion. The Tribe contends that Chapter 36 is void for failure

## I

The Confederated Bands and Tribes of the Yakima Indian Nation comprise 14 originally distinct Indian tribes that joined together in the middle of the 19th century for purposes of their relationships with the United States. A treaty was signed with the United States in 1855, under which it was agreed that the various tribes would be considered "one nation" and that specified lands located in the Territory of Washington would be set aside for their exclusive use. The treaty was ratified by Congress in 1859. 12 Stat. 951. Since that time, the Yakima Nation has without interruption maintained its tribal identity.

The Yakima Reservation is located in the southeastern part of the State of Washington and now consists of approximately 1,387,505 acres of land, of which some 80% is held in trust by the United States for the Yakima Nation or individual members of the Tribe. The remaining parcels of land are held in fee by Indian and non-Indian owners. Much of the trust acreage on the Reservation is forest. The Tribe receives the bulk of its income from timber, and over half of the Reservation is closed to permanent settlement in order to protect the forest area. The remaining lands are primarily agricultural.

---

to meet the standards of definiteness required by the Due Process Clause of the Fourteenth Amendment, asserting that the eight subject-matter categories over which the State has extended full jurisdiction are too vague to give tribal members adequate notice of what conduct is punishable under state law. This challenge is without merit. As the District Court observed, Chapter 36 creates no new criminal offenses but merely extends jurisdiction over certain classes of offenses defined elsewhere in state law. If those offenses are not sufficiently defined, individual tribal members may defend against any prosecutions under them at the time such prosecutions are brought. See *Younger* v. *Harris*, 401 U. S. 37. The eight subject-matter areas are themselves defined with reasonable clarity in language no less precise than that commonly accepted in federal jurisdictional statutes in the same field. See *United States* v. *Mazurie*, 419 U. S. 544. The District Court's ruling that Chapter 36 is not void for vagueness under the Due Process Clause of the Fourteenth Amendment was therefore correct.

There are three incorporated towns on the Reservation, the largest being Toppenish, with a population of under 6,000.

The land held in fee is scattered throughout the Reservation, but most of it is concentrated in the northeastern portion close to the Yakima River and within the three towns of Toppenish, Wapato, and Harrah. Of the 25,000 permanent residents of the Reservation, 3,074 are members of the Yakima Nation, and tribal members live in all of the inhabited areas of the Reservation.[6] In the three towns—where over half of the non-Indian population resides—members of the Tribe are substantially outnumbered by non-Indian residents occupying fee land.

Before the enactment of the state law here in issue, the Yakima Nation was subject to the general jurisdictional principles that apply in Indian country in the absence of federal legislation to the contrary. Under those principles, which received their first and fullest expression in *Worcester* v. *Georgia,* 6 Pet. 515, 517, state law reaches within the exterior boundaries of an Indian reservation only if it would not infringe "on the right of reservation Indians to make their own laws and be ruled by them." *Williams* v. *Lee,* 358 U. S. 217, 219–220.[7] As a practical matter, this has meant that criminal offenses by or against Indians have been subject only to federal or tribal laws, *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463, except where Congress in the exercise of its plenary and exclusive power over Indian affairs has "expressly

---

[6] These are the membership figures given by the District Court. The United States, in its *amicus curiae* brief, has indicated that more than 5,000 tribal members live permanently on the Reservation and that the number increases during the summer months.

[7] These abstract principles do not and could not adequately describe the complex jurisdictional rules that have developed over the years in cases involving jurisdictional clashes between the States and tribal Indians since *Worcester* v. *Georgia* was decided. For a full treatment of the subject, see generally M. Price, Law and the American Indian (1973); U. S. Dept. of Interior, Federal Indian Law (1958).

provided that State laws shall apply." *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 170–171.

Public Law 280, upon which the State of Washington relied for its authority to assert jurisdiction over the Yakima Reservation under Chapter 36, was enacted by Congress in 1953 in part to deal with the "problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." *Bryan* v. *Itasca County,* 426 U. S. 373, 379; H. R. Rep. No. 848, 83d Cong., 1st Sess., 5–6 (1953). The basic terms of Pub. L. 280, which was the first federal jurisdictional statute of general applicability to Indian reservation lands,[8] are well known.[9] To five States it effected

---

[8] See Price, *supra* n. 7, at 210. Before 1953, there had been other surrenders of authority to some States. See, *e. g.,* 62 Stat. 1224, 25 U. S. C. § 232 (New York), 64 Stat. 845, 25 U. S. C. § 233 (New York); 54 Stat. 249 (Kansas); 60 Stat. 229 (North Dakota); and 62 Stat. 1161 (Iowa). Public Law 280, however, was the first federal statute to attempt an omnibus transfer.

[9] The Act provides in full:

"AN ACT

"To confer jurisdiction on the States of California, Minnesota, Nebraska, Oregon, and Wisconsin, with respect to criminal offenses and civil causes of action committed or arising on Indian reservations within such States, and for other purposes.

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That chapter 53 of title 18, United States Code, is hereby amended by inserting at the end of the chapter analysis preceding section 1151 of such title the following new item:

" '1162. State jurisdiction over offenses committed by or against Indians in the Indian country.'

"SEC. 2. Title 18, United States Code, is hereby amended by inserting in chapter 53 thereof immediately after section 1161 a new section, to be designated as section 1162, as follows:

" '§ 1162. State jurisdiction over offenses committed by or against Indians in the Indian country

" '(a) Each of the States listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State to the same extent that such

472

an immediate cession of criminal and civil jurisdiction over Indian country, with an express exception for the reservations of three tribes. Pub. L. 280, §§ 2 and 4.[10] To the remaining

State has jurisdiction over offenses committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State:

| " 'State of | Indian country affected |
| --- | --- |
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State, except the Menominee Reservation |

" '(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

" '(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section.'

"SEC. 3. Chapter 85 of title 28, United States Code, is hereby amended by inserting at the end of the chapter analysis preceding section 1331 of such title the following new item:

" '1360. State civil jurisdiction in actions to which Indians are parties.'

"SEC. 4. Title 28, United States Code, is hereby amended by inserting in chapter 85 thereof immediately after section 1359 a new section, to be designated as section 1360, as follows:

" '§ 1360. State civil jurisdiction in actions to which Indians are parties

" '(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are

States it gave an option to assume jurisdiction over criminal offenses and civil causes of action in Indian country without consulting with or securing the consent of the tribes that

parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

" 'State of            Indian country affected

California   All Indian country within the State

Minnesota   All Indian country within the State, except the Red Lake Reservation

Nebraska   All Indian country within the State

Oregon   All Indian country within the State, except the Warm Springs Reservation

Wisconsin   All Indian country within the State, except the Menominee Reservation

" '(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

" '(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section.'

"SEC. 5. Section 1 of the Act of October 5, 1949 (63 Stat. 705, ch. 604), is hereby repealed, but such repeal shall not affect any proceedings heretofore instituted under that section.

"SEC. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment

would be affected. States whose constitutions or statutes contained organic law disclaimers of jurisdiction over Indian country were dealt with in § 6.[11]  The people of those States were given permission to amend "where necessary" their state constitutions or existing statutes to remove any legal impediment to the assumption of jurisdiction under the Act. All others were covered in § 7.[12]

The Washington Constitution contains a disclaimer of authority over Indian country,[13] and the State is, therefore, one of those covered by § 6 of Pub. L. 280. The State did not take any action under the purported authority of Pub. L. 280 until 1957. In that year its legislature enacted a statute which obligated the State to assume criminal and civil jurisdiction over any Indian reservation within the State at the request of the tribe affected.[14]  Under this legislation state jurisdiction was requested by and extended to several Indian tribes within the State.[15]

---

to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

"SEC. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

[10] See n. 9, *supra.* The five States given immediate jurisdiction were California, Minnesota, Nebraska, Oregon, and Wisconsin. Alaska was added to this group in 1958. Act of Aug. 8, 1958, 72 Stat. 545, codified at 18 U. S. C. § 1162, 28 U. S. C. § 1360.

[11] See n. 9, *supra.*

[12] See n. 9, *supra.*

[13] Wash. Const., Art. XXVI, ¶ 2.

[14] Wash. Rev. Code, ch. 37.12 (1976).

[15] For a detailed discussion of the Washington history under Pub. L. 280, see 1 National American Indian Court Judges Assn., Justice and the

In one of the first prosecutions brought under the 1957 jurisdictional scheme, an Indian defendant whose tribe had consented to the extension of jurisdiction challenged its validity on the ground that the disclaimer clause in the state constitution had not been amended in the manner allegedly required by § 6 of Pub. L. 280. *State* v. *Paul*, 53 Wash. 2d 789, 337 P. 2d 33. The Washington Supreme Court rejected the argument, construing the state constitutional provision to mean that the barrier posed by the disclaimer could be lifted by the state legislature.[16]

In 1963, Washington enacted Chapter 36, the law at issue in this litigation.[17] The most significant feature of the new statute was its provision for the extension of at least some jurisdiction over all Indian lands within the State, whether or not the affected tribe gave its consent. Full criminal and civil jurisdiction to the extent permitted by Pub. L. 280 was extended to all fee lands in every Indian reservation and to trust and allotted lands therein when non-Indians were involved. Except for eight categories of law, however, state jurisdiction was not extended to Indians on allotted and trust lands unless the affected tribe so requested. The eight jurisdictional categories of state law that were thus extended to all parts of every Indian reservation were in the areas of compulsory school attendance, public assistance, domestic relations,

---

American Indian: The Impact of Public Law 280 upon the Administration of Justice on Indian Reservations (1974).

[16] The Washington Supreme Court relied upon a previous decision in which it had rejected a challenge to Washington legislation permitting taxation of property leased from the Federal Government. *Boeing Aircraft Co.* v. *Reconstruction Finance Corp.*, 25 Wash. 2d 652, 171 P. 2d 838. The *Boeing* legislation was challenged on the ground that the State had failed to remove by amendment a constitutional disclaimer of authority to tax federal property, and the Washington court held in *Boeing* that legislative action was sufficient.

[17] See n. 1, *supra*.

mental illness, juvenile delinquency, adoption proceedings, dependent children, and motor vehicles.[18]

The Yakima Indian Nation did not request the full measure of jurisdiction made possible by Chapter 36, and the Yakima Reservation thus became subject to the system of jurisdiction outlined at the outset of this opinion.[19] This litigation followed.

## II

The Yakima Nation relies on three separate and independent grounds in asserting that Chapter 36 is invalid. First, it argues that under the terms of Pub. L. 280 Washington was not authorized to enact Chapter 36 until the state constitution had been amended by "the people" so as to eliminate its Art. XXVI which disclaimed state authority over Indian lands.[20]

---

[18] See nn. 1 and 5, *supra.*

[19] Those tribes that had consented to state jurisdiction under the 1957 law remained fully subject to such jurisdiction. Wash. Rev. Code §37.12.010 (1976). Since 1963 only one tribe, the Colville, has requested the extension of full state jurisdiction. 1 National American Indian Court Judges, *supra* n. 15, at 77–81. The Yakima Nation, ever since 1952 when its representatives objected before a congressional committee to a predecessor of Pub. L. 280, see n. 33, *infra,* has consistently contested the wisdom and the legality of attempts by the State to exercise jurisdiction over its Reservation lands. See *ibid.*

[20] Washington strenuously argues that this question is not properly before the Court. We think that it is. The Yakima Indian Nation has pressed this issue throughout the litigation. In its motion to dismiss or affirm, the alleged invalidity of Washington's legislative assumption of jurisdiction was presented as a basis upon which the judgment below should be sustained. See n. 5, *supra.* As the prevailing party, the appellee was of course free to defend its judgment on any ground properly raised below whether or not that ground was relied upon, rejected, or even considered by the District Court or the Court of Appeals. *United States* v. *American Ry. Express Co.,* 265 U. S. 425, 435–436; *Dandridge* v. *Williams,* 397 U. S. 471, 475, and n. 6. Moreover, the disclaimer issue was implicit in the subjects the parties were requested to address in our order noting probable jurisdiction of this appeal. 435 U. S. 903. Cf. *Gent* v.

Second, it contends that Pub. L. 280 does not authorize a State to extend only partial jurisdiction over an Indian reservation. Finally, it asserts that Chapter 36, even if authorized

*Arkansas,* 384 U. S. 937; *Zicarelli* v. *New Jersey State Comm'n,* 401 U. S. 933.

Washington also contends that this Court's summary dismissals in *Makah Indian Tribe* v. *State,* 76 Wash. 2d 485, 457 P. 2d 590, appeal dismissed, 397 U. S. 316; *Tonasket* v. *State,* 84 Wash. 2d 164, 525 P. 2d 744, appeal dismissed, 420 U. S. 915; and *Comenout* v. *Burdman,* 84 Wash. 2d 192, 525 P. 2d 217, appeal dismissed, 420 U. S. 915, should preclude reconsideration of the disclaimer issue here. In those cases, it had been argued that Washington's statutory assumption of jurisdiction was ineffective under Pub. L. 280 and invalid under the state constitution because of the absence of a constitutional amendment eliminating Art. XXVI. In each case, the Washington Supreme Court rejected both the state constitutional and the federal arguments. On appeal from each, the appellants questioned the validity of the state court's conclusion that under the federal statute no constitutional amendment was required. Our summary dismissals are, of course, to be taken as rulings on the merits, *Hicks* v. *Miranda,* 422 U. S. 332, 343–345, in the sense that they rejected the "specific challenges presented in the statement of jurisdiction" and left "undisturbed the judgment appealed from." *Mandel* v. *Bradley,* 432 U. S. 173, 176. They do not, however, have the same precedential value here as does an opinion of this Court after briefing and oral argument on the merits, *Edelman* v. *Jordan,* 415 U. S. 651, 670–671; *Richardson* v. *Ramirez,* 418 U. S. 24, 53. A summary dismissal of an appeal represents no more than a view that the judgment appealed from was correct as to those federal questions raised and necessary to the decision. It does not, as we have continued to stress, see, *e. g., Mandel* v. *Bradley, supra,* necessarily reflect our agreement with the opinion of the court whose judgment is appealed. It is not at all unusual for the Court to find it appropriate to give full consideration to a question that has been the subject of previous summary action. *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 309 n. 1; *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1, 14. We do so in this case. The question that Washington asks us to avoid or to resolve on the basis of *stare decisis* has never received full plenary attention here. It has been the subject of extensive briefing and argument by the parties. It has provoked several, somewhat uncertain, opinions from the Washington courts, see n. 27, *infra,* whose ultimate judgments were the subjects of summary dismissals here. Finally, it is an

by Pub. L. 280, violates the Fourteenth Amendment of the Constitution. We turn now to consideration of each of these arguments.

## III

We first address the contention that Washington was required to amend its constitution before it could validly legislate under the authority of Pub. L. 280. If the Tribe is correct, we need not consider the statutory and constitutional questions raised by the system of partial jurisdiction established in Chapter 36. The Tribe, supported by the United States as *amicus curiae*,[21] argues that a requirement for popular amendatory action is to be found in the express terms of § 6 of Pub. L. 280 or, if not there, in the terms of the Enabling Act that admitted Washington to the Union.[22] The

issue upon which the Executive Branch of the United States Government has recently changed its position diametrically, as explained in its *amicus* brief and oral argument in this case.

[21] The United States has fully briefed the constitutional amendment question and the question whether partial jurisdiction is authorized by Pub. L. 280. Its position on the equal protection holding of the Court of Appeals is equivocal.

[22] The Tribe also contends that under its 1855 Treaty with the United States, 12 Stat. 951, it was guaranteed a right of self-government that was not expressly abrogated by Pub. L. 280. The argument assumes that under our cases, see, *e. g., Menominee Tribe* v. *United States,* 391 U. S. 404, treaty rights are preserved unless Congress has shown a specific intent to abrogate them. Although we have stated that the intention to abrogate or modify a treaty is not to be lightly imputed, *id.,* at 413; *Pigeon River Co.* v. *Cox Co.,* 291 U. S. 138, 160, this rule of construction must be applied sensibly. In this context, the argument made by the Tribe is tendentious. The treaty right asserted by the Tribe is jurisdictional. So also is the entire subject matter of Pub. L. 280. To accept the Tribe's position would be to hold that Congress could not pass a jurisdictional law of general applicability to Indian country unless in so doing it itemized all potentially conflicting treaty rights that it wished to affect. This we decline to do. The intent to abrogate inconsistent treaty rights is clear enough from the express terms of Pub. L. 280.

argument can best be understood in the context of the specific statutory provisions involved.

A

The Enabling Act under which Washington, along with the States of Montana, North Dakota, and South Dakota, gained entry into the Union, was passed in 1889.[23] Section 4 of that

---

[23] Act of Feb. 22, 1889, ch. 180, § 4, 25 Stat. 676. The Act provides:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the inhabitants of all that part of the area of the United States now constituting the Territories of Dakota, Montana, and Washington, as at present described, may become the States of North Dakota, South Dakota, Montana, and Washington, respectively, as hereinafter provided.

.　　　　.　　　　.　　　　.　　　　.

"SEC. 4. That the delegates to the conventions elected as provided for in this act shall meet at the seat of government of each of said Territories . . . after organization, shall declare, on behalf of the people of said proposed States, that they adopt the Constitution of the United States; whereupon the said conventions shall be, and are hereby, authorized to form constitutions and States governments for said proposed States, respectively. The constitutions shall be republican in form, and make no distinction in civil or political rights on account of race or color, except as to Indians not taxed, and not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence. And said conventions shall provide, by ordinances irrevocable without the consent of the United States and the people of said States:

.　　　　.　　　　.　　　　.　　　　.

"Second. That the people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States . . . ."

Other admitting Acts requiring a disclaimer of authority over Indian lands are Act of July 16, 1894, ch. 138, 28 Stat. 107 (Utah); Act of June 16, 1906, ch. 3335, 34 Stat. 267 (Oklahoma); Act of June 20, 1910,

480

Act required the constitutional conventions of the prospective new States to enact provisions by which the people disclaimed title to lands owned by Indians or Indian tribes and acknowledged that those lands were to remain "under the absolute jurisdiction and control of" Congress until the Indian or United States title had been extinguished. The disclaimers were to be made "by ordinances irrevocable without the consent of the United States and the people of said States." Washington's constitutional convention enacted the disclaimer of authority over Indian lands as part of Art. XXVI of the state constitution.[24]   That Article, captioned "Compact with

ch. 310, 36 Stat. 557 (Arizona and New Mexico).   The language of these Acts is virtually the same as that of 25 Stat. 676.

[24] Article XXVI reads as follows:

"COMPACT WITH THE UNITED STATES

"The following ordinance shall be irrevocable without the consent of the United States and the people of this state:

.              .              .              .              .

"Second.   That the people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries of this state, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States and that the lands belonging to citizens of the United States residing without the limits of this state shall never be taxed at a higher rate than the lands belonging to residents thereof; and that no taxes shall be imposed by the state on lands or property therein, belonging to or which may be hereafter purchased by the United States or reserved for use: *Provided,* That nothing in this ordinance shall preclude the state from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any act of congress containing a provision exempting the lands thus granted from taxation, which exemption shall continue so long and to such an extent as such act of congress may prescribe."

the United States," is prefaced with the statement—precisely tracking the language of the admitting statute—that "the following ordinance shall be irrevocable without the consent of the United States and the people of [the State of Washington]." Its substantive terms mirror the language used in the enabling legislation.

We have already noted that two distinct provisions of Pub. L. 280 are potentially applicable to States not granted an immediate cession of jurisdiction. The first, § 6, without question applies to Washington and the seven other States admitted into the Union under enabling legislation requiring organic law disclaimers similar to that just described. This much is clear from the legislative history of Pub. L. 280,[25] as well as from the express language of § 6. That section provides

"Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be."

All other States were covered by § 7. In that section Congress gave the consent of the United States

"to any other State . . . to assume jurisdiction at such

---

[25] See H. R. Rep. No. 848, 83d Cong., 1st Sess. (1953). According to this report accompanying H. R. 1063 (the House version of Pub. L. 280) "[e]xamination of the Federal statutes and State constitutions has revealed that enabling acts for eight States, and in consequence the constitutions of those States, contain express disclaimers of jurisdiction. Included are Arizona, Montana, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, and Washington." H. R. Rep. No. 848, at 6.

time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

These provisions appear to establish different modes of procedure by which an option State, depending on which section applies to it, is to accept the Pub. L. 280 jurisdictional offer. The procedure specified in § 7 is straightforward: affirmative legislative action by which the State obligates and binds itself to assume jurisdiction. Section 6, in contrast, is delphic. The only procedure mentioned is action by the people "to amend . . . their State constitutions or existing statutes, as the case may be" to remove any legal impediments to the assumption of jurisdiction. The phrase "where necessary" in the main clause suggests that a requirement for popular—as opposed to legislative—action must be found if at all in some source of law independent of Pub. L. 280. The proviso, however, has a different import.

## B

The proper construction to be given to the single inartful sentence in § 6 has provoked chapters of argument from the parties. The Tribe and the United States urge that notwithstanding the phrase "where necessary," § 6 should be construed to mandate constitutional amendment by disclaimer States. It is their position that § 6 operates not only to grant the consent of the United States to state action inconsistent with the terms of the enabling legislation but also to establish a distinct procedure to be followed by Enabling Act States. To support their position, they rely on the language of the proviso and upon certain legislative history of § 6.[26]

In the alternative, the Tribe and the United States argue that popular amendatory action, if not compelled by the terms of § 6, is mandated by the terms of the Enabling Act of

---

[26] See n. 35, *infra,* and accompanying text.

Feb. 22, 1889, ch. 180, § 4. Although they acknowledge that Congress in § 6 did grant the "consent of the United States" required under the Enabling Act before the State could remove the disclaimer, they contend that § 6 did not eliminate the need for the "consent of the people" specified in the Enabling Act. In their view, the 1889 Act—if not Pub. L. 280—dictates that constitutional amendment is the only valid procedure by which that consent can be given.

The State draws an entirely different message from § 6. It contends that the section must be construed in light of the overall congressional purpose to facilitate a transfer of jurisdiction to those option States willing to accept the responsibility. Section 6 was designed, it says, not to establish but to remove legal barriers to state action under the authority of Pub. L. 280. The phrase "where necessary" in its view is consistent with this purpose. It would construe the word "appropriately" in the proviso to be synonymous with "where necessary" and the entire section to mean that constitutional amendment is required only if "necessary" as a matter of state law. The Washington Supreme Court having found that legislative action is sufficient to grant the "consent of the people" to removal of the disclaimer in Art. XXVI of the state constitution,[27] the State argues that the procedural

---

[27] The validity of Chapter 36 was first challenged in the federal courts in *Quinault Tribe of Indians* v. *Gallagher*, 368 F. 2d 648 (CA9). In *Quinault*, the Court of Appeals for the Ninth Circuit held that under § 6 and the Enabling Act the consent of the people to removal of the disclaimer need only be made in some manner "valid and binding under state law." *Id.*, at 657. Relying on the Washington Supreme Court's holding in *State* v. *Paul*, 53 Wash. 2d 789, 337 P. 2d 33, that legislative action would suffice, it concluded that Washington's assumption of jurisdiction was valid. When Chapter 36 was first challenged in the state courts, the Washington Supreme Court reaffirmed its holding in *State* v. *Paul*. See *Makah Indian Tribe* v. *State*, 76 Wash. 2d 485, 457 P. 2d 590; *Tonasket* v. *State*, 84 Wash. 2d 164, 525 P. 2d 744. See also n. 16, *supra*. In *Makah*, the Court reasoned, as it had in *Paul*, that the makers of the

requirements of § 6 have been fully satisfied. It finds the Enabling Act irrelevant since in its view § 6 effectively repealed any federal-law impediments in that Act to state assertion of jurisdiction under Pub. L. 280.[28]

## C

From our review of the statutory, legislative, and historical materials cited by the parties, we are persuaded that Washington's assumption of jurisdiction by legislative action fully complies with the requirements of § 6. Although we adhere to the principle that the procedural requirements of Pub. L. 280 must be strictly followed, *Kennerly* v. *District Court of Montana,* 400 U. S. 423, 427; *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S., at 180, and to the general rule that ambiguities in legislation affecting retained tribal sovereignty are to be construed in favor of the Indians, see, *e. g., Bryan* v. *Itasca County,* 426 U. S., at 392, those principles will not stretch so far as to permit us to find a federal requirement affecting the manner in which the States are to modify their organic legislation on the basis of materials that are essentially speculative. Cf. *Board of County Comm'rs* v. *United States,* 308 U. S. 343, 350–351. The language of § 6, its legislative

Washington Constitution intended that for purposes of Art. XXVI "the people would speak through the mouth of the legislature." 76 Wash. 2d, at 490, 457 P. 2d, at 593. In addition, it relied on *Quinault* for the proposition that under § 6 the constitutional disclaimer need be removed only by a method binding under state law. In *Tonasket,* the Washington court reaffirmed this reasoning. It also relied on the alternative ground that the disclaimer in Art. XXVI could be construed not to preclude "criminal and civil regulation" on Indian lands and therefore would not stand as a barrier to state jurisdiction. 84 Wash. 2d, at 177, 525 P. 2d, at 752.

[28] The State asserts as well that the Washington constitutional disclaimer does not pose any substantive barrier to state assumption of jurisdiction over fee and unrestricted lands within the reservation. In light of our holding that Washington has satisfied the procedural requirements for repealing the disclaimer, we need not consider the scope of this state constitutional provision.

history, and its role in Pub. L. 280 all clearly point the other way.

We turn first to the language of § 6. The main clause is framed in permissive, not mandatory, terms. Had the drafters intended by that clause to require popular amendatory action, it is unlikely that they would have included the words "where necessary." As written, the clause suggests that the substantive requirement for constitutional amendment must be found in some source of law independent of § 6. The basic question, then, is whether that requirement can be found in the language of the proviso to § 6 or alternatively in the terms of the Enabling Act.

We are unable to find the procedural mandate missing from the main clause of § 6 in the language of the proviso. That language in the abstract could be read to suggest that constitutional amendment is a condition precedent to a valid assumption of jurisdiction by disclaimer States. When examined in its context, however, it cannot fairly be read to impose such a condition. Two considerations prevent this reading. First, it is doubtful that Congress—in order to compel disclaimer States to amend their constitutions by popular vote—would have done so in a provision the first clause of which consents to that procedure "where necessary" and the proviso to which indicates that the procedure is to be followed if "appropriate." Second, the reference to popular amendatory action in the proviso is not framed as a description of the procedure the States must follow to assume jurisdiction, but instead is written as a condition to the effectiveness of "the provisions of" Pub. L. 280. When it is recalled that the only substantive provisions of the Act—other than those arguably to be found in § 7—accomplish an immediate transfer of jurisdiction to specifically named States, it seems most likely that the proviso was included to ensure that § 6 would not be construed to effect an immediate transfer to the disclaimer group of option States. The main clause removes a federal-law bar-

rier to any new state jurisdiction over Indian country. The proviso suggests that disclaimer States are not automatically to receive jurisdiction by virtue of that removal. Without the proviso, in the event that state constitutional amendment were not found "necessary," [29] § 6 could be construed as effecting an immediate cession. Congress clearly wanted all the option States to "obligate and bind" themselves to assume the jurisdiction offered in Pub. L. 280.[30] To

---

[29] Disclaimer States have responded in diverse ways to the Pub. L. 280 offer of jurisdiction. See Goldberg, Pub. L. 280: The Limits of State Jurisdiction over Reservation Indians, 22 UCLA L. Rev. 535, 546–548, 567–575 (1975). Only one—North Dakota—has amended its constitution. Art. 16, N. D. Const., amended by Art. 68, June 24, 1958 (1957 N. D. Laws, ch. 403; 1959 N. D. Laws, ch. 430).

[30] In *Kennerly* v. *District Court of Montana*, 400 U. S. 423, we emphasized the need for the responsible jurisdictions to "manifes[t] by political action their willingness and ability to discharge their new responsibilities." *Id.*, at 427. *Kennerly* involved an attempt by the state courts of Montana to assert civil jurisdiction over a transaction that occurred within reservation boundaries. The tribe had requested state jurisdiction, but the State had not obligated itself to assume it. The case was litigated on the theory that § 7 was applicable. We held that the State must comply with the § 7 requirement of "affirmative legislative action." 400 U. S., at 427. Two of our other cases involving Pub. L. 280 also illustrate the need for responsible action under the federal statute. In *Williams* v. *Lee*, 358 U. S. 217, we held that the State of Arizona—one of the disclaimer States— could not validly exercise jurisdiction over a civil action brought by a non-Indian against an Indian for a transaction that occurred on the Navaho Reservation. We relied on the traditional principle that a State may not infringe the right of reservation Indians "to make their own laws and be ruled by them" without an express authorization by Congress. *Id.*, at 220. In *Williams*, the State had not attempted to comply with § 6: the state court had taken jurisdiction without state statutory or constitutional authorization. A similar situation obtained in *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164. There we held that Arizona could not, by simple legislative enactment, tax income earned by a Navaho from reservation sources. The tax statute at issue was not framed as a measure obligating the State to assume responsibility under Pub. L. 280.

be sure, constitutional amendment was referred to as the process by which this might be accomplished in disclaimer States. But, given the distinction that Congress clearly drew between those States and automatic-transfer States, this reference can hardly be construed to require that process.

Before turning to the legislative history, which, as we shall see, accords with this interpretation of § 6, we address the argument that popular amendatory action, if not a requirement of Pub. L. 280, is mandated by the legislation admitting Washington to the Union. This argument requires that two assumptions be made. The first is that § 6 eliminated some but preserved other Enabling Act barriers to a State's assertion of jurisdiction over Indian country. The second is that the phrase "where necessary" in the main clause of § 6 was intended to refer to those federal-law barriers that had been preserved. Only if each of these premises is accepted does the Enabling Act have any possible application.

Since we find the first premise impossible to accept, we proceed no further. Admitting legislation is, to be sure, the only source of law mentioned in the main clause of § 6 and might therefore be looked to as a referent for the phrase "where necessary" in the clause. This reading, however, is not tenable. It supplies no satisfactory answer to the question why Congress—in order to give the consent of the United States to the removal of state organic law disclaimers—would not also have by necessary implication consented to the removal of any procedural constraints on the States imposed by the Enabling Acts. The phrase "[n]otwithstanding the provisions of any Enabling Act" in § 6 is broad—broad enough to suggest that Congress when it referred to a possible necessity for state constitutional amendment did not intend thereby to perpetuate any such requirement in an Enabling Act. Even assuming that the phrase "consent of the people" in the Enabling Act must be construed to preclude consent by legislative action—and the Tribe and the United States have of-

fered no concrete authority to support this restrictive reading of the phrase—[31] we think it obvious that in the "notwithstanding" clause of § 6 Congress meant to remove any federal impediments to state jurisdiction that may have been created by an Enabling Act.

The legislative history of Pub. L. 280 supports the conclusion that § 6 did not of its own force establish a state constitutional amendment requirement and did not preserve any such requirement that might be found in an Enabling Act. Public Law 280 was the first jurisdictional bill of general applicability ever to be enacted by Congress. It reflected congressional concern over the law-and-order problems on Indian reservations and the financial burdens of continued federal jurisdictional responsibilities on Indian lands, *Bryan* v. *Itasca County,* 426 U. S. 373. It was also, however, without question reflective of the general assimilationist policy followed by Congress from the early 1950's through the late 1960's.[32]

---

[31] There is, for example, nothing in the legislative history of the Enabling Act to indicate that the "consent of the people" could be given only by a process of constitutional amendment. The scant legislative record of the Enabling Act is devoted to a debate over the wisdom of splitting the Dakota Territory into two States and of admitting both immediately to the Union. In none of these debates was there any extended discussion of the Indian land disclaimer or any indication that the "consent of the people" to removal of the disclaimer could not be given by the people's representatives in the legislature. See Adverse Reports of the House Committee on the Territories, May 1886 and Feb. 1888, annexed to H. R. Rep. No. 1025, 50th Cong., 1st Sess., 19–25 (1888). See also, *e. g.,* 19 Cong. Rec. 2804, 2883, 3001, 3117 (1888); 20 Cong. Rec. 801, 869 (1889). The only explicit references to the disclaimer of authority over Indian lands are found in H. R. Rep. No. 1025, *supra,* at 8–9 (calling attention to fact that by the terms of the bill large Indian reservations in the Dakota Territory "remain within the exclusive control and jurisdiction of the United States") and in 19 Cong. Rec. 2832 (1888) (Oklahoma Delegate objecting to the disclaimer).

[32] That policy was formally announced in H. R. Con. Res. 108, 67 Stat.

See H. R. Rep. No. 848, 83d Cong., 1st Sess. (1953). See also Hearings on H. R. 459, H. R. 3235, and H. R. 3624 before the Subcommittee on Indian Affairs of the House Committee on .Interior and Insular Affairs, 82d Cong., 2d Sess. (1952) (hereinafter 1952 Hearings). The failure of Congress to write a tribal-consent provision into the transfer provision applicable to option States as well as its failure to consult with the tribes during the final deliberations on Pub. L. 280 provide ample evidence of this.[33]

B132, approved on July 27, 1953, the same day that Pub. L. 280 was passed by the House. 99 Cong. Rec. 9968 (1953). As stated in H. R. Con. Res. 108, the policy of Congress was "as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship . . . ."

This policy reflected a return to the philosophy of the General Allotment Act of 1887, ch. 119, § 1, 24 Stat. 388, as amended, 25 U. S. C. § 331, popularly known as the Dawes Act, a philosophy which had been rejected with the passage of the Indian Reorganization Act of 1934, 48 Stat. 984.

In *Bryan* v. *Itasca County,* 426 U. S. 373, the Court emphasized that Pub. L. 280 was not a termination measure and should not be construed as such. Our discussion here is not to the contrary. The parties agree that Pub. L. 280 reflected an assimilationist philosophy. That Congress intended to facilitate assimilation when it authorized a transfer of jurisdiction from the Federal Government to the States does not necessarily mean, however, that it intended in Pub. L. 280 to terminate tribal self-government. Indeed, the Tribe has argued that even after the transfer tribal courts retain concurrent jurisdiction in areas in which they formerly shared jurisdiction with the Federal Government. This issue, however, is not within the scope of our order noting probable jurisdiction, see n. 20, *supra,* and we do not decide it here.

[33] These features of Pub. L. 280 have attracted extensive criticism. See generally Goldberg, *supra* n. 29. Indeed, the experience of the Yakima Nation is in itself sufficient to demonstrate why the Act has provoked so much criticism. In 1952, in connection with the introduction of bills that proposed a general jurisdictional transfer, see 1952 Hearings, a representa-

Indeed, the circumstances surrounding the passage of Pub. L. 280 in themselves fully bear out the State's general thesis that Pub. L. 280 was intended to facilitate, not to impede, the transfer of jurisdictional responsibility to the States. Public Law 280 originated in a series of individual bills introduced in the 83d Congress to transfer jurisdiction to the five willing States which eventually were covered in §§ 2 and 4.[34] H. R. Rep. No. 848, *supra.* Those bills were consolidated into H. R. 1063, which was referred to the House Committee on Interior and Insular Affairs for consideration. Closed hearings on the bills were held before the Subcommittee on Indian Affairs on June 29 and before the Committee on July 15, 1953.[35] During the opening session on June 29,

---

tive of the Yakimas testified that the Tribe was opposed to the extension of state jurisdiction on the Yakima Reservation. He stated:

"The Yakima Indians . . . feel that in the State Courts they will not be treated as well as they are in the Federal courts, because they believe that many of the citizens of the State are still prejudiced against the Indians.

"They are now under the Federal laws and have their own tribal laws, customs, and regulations. This system is working well and the Yakima Tribe believes that it should be continued and not changed at this time." *Id.,* at 84–85.

In 1953, when the Indian Affairs Subcommittee of the House Committee on Indian Affairs considered the final version of Pub. L. 280, the Committee was again aware that the Yakima Nation opposed state jurisdiction. The House Report accompanying H. R. 1063 contains a letter from the Department of the Interior listing the Tribe as among those opposed to "being subjected to State jurisdiction" and having a "tribal law-and-order organization that functions in a reasonably satisfactory manner." H. R. Rep. No. 848, 83d Cong., 1st Sess., 7 (1953). Had Washington been included among the mandatory States, it is thus quite possible that the Yakima Reservation would have been excepted.

[34] Similar bills had been introduced in the 82d Congress, and in public hearings held on those the idea of a general transfer was discussed at length. See 1952 Hearings.

[35] See unpublished transcript of Hearings on H. R. 1063 before the Subcommittee on Indian Affairs of the House Committee on Interior and In-

Committee Members, counsel, and representatives of the Department of the Interior discussed various proposals designed to give H. R. 1063 general applicability. June 29 Hearings 1–22. It rapidly became clear that the Members favored a general bill. *Ibid.* At this point, Committee counsel noted that several States "have constitutional prohibitions against jurisdiction." *Id.*, at 23. There followed some discussion of the manner in which these States should be treated. On July 15, a version of § 6 was proposed. July 15 Hearings 6. After further discussion of the disclaimer problem, the "notwithstanding" clause was added, *id.*, at 9, and the language eventually enacted as § 6 was approved by the Committee that day. The speed and the context alone suggest that § 6 was designed to remove an obstacle to state jurisdiction, not to create one. And the discussion at the hearings, which in essence were markup sessions, makes this clear.[36]

---

sular Affairs, 83d Cong., 1st Sess. (June 29, 1953), and unpublished transcript of Hearings on H. R. 1063 before the House Committee on Interior and Insular Affairs, 83d Cong., 1st Sess. (July 15, 1953) (hereinafter cited as June 29 Hearings and July 15 Hearings, respectively). The transcripts of these hearings were first made available to this Court by the United States during the briefing of *Tonasket* v. *Washington,* 411 U. S. 451. They were again supplied in *Bryan* v. *Itasca County, supra,* and for this appeal have been reproduced in full in the Appendix to Brief for Appellee. These hearings, along with the House Report on H. R. 1063 as amended, H. R. Rep. No. 848, *supra,* and the Senate Report, which is virtually identical, S. Rep. No. 699, 83d Cong., 1st Sess. (1953), constitute the primary legislative materials on Pub. L. 280.

[36] On July 15, Committee counsel presented an amendment which was eventually to become § 6. He explained the effect of the amendment as follows:

"[T]he legislation as acted upon by the committee would apply to only five states. The two additional section amendments would apply first to the eight states having constitutional or organic law impediments and would grant consent of the United States for them to remove such impediments and thus to acquire jurisdiction.

"The other amendment would apply to any other Indian states . . .

492

While some Committee Members apparently thought that § 6 States, as a matter of state law, would have to amend their constitutions in order to remove the disclaimers found there,[37]

who would acquire jurisdiction at such time as the legislative body affirmatively indicated their desire to so assume jurisdiction." July 15 Hearings 4.

Immediately after the proposed § 6 was read to the Subcommittee, the Chairman, Congressman D'Ewart, commented:

"I do not think we have to grant permission to a state to amend its own statutes." July 15 Hearings 7.

Committee counsel replied:

"Mr. D'Ewart, I believe the reason for this is that in some instances it is spelled out both in the constitution and the statutory provisions as a result of the Act and it may be unnecessary, but by some state courts it may be interpreted as being necessary." *Ibid.*

The version of § 6 read to the Committee Members by counsel contained no reference to the Enabling Acts but merely granted consent for the States to remove existing impediments to the assertion of jurisdiction over Indians. It was suggested that in order effectively to authorize the States to modify their organic legislation the clause should be more specific. This suggestion resulted in the proposal of the "notwithstanding" clause. The following exchange then took place:

"[Committee counsel]: I believe that clause 'notwithstanding any provisions of the Enabling Act' for such states might well be included. It would make clear that Congress was repealing the Enabling Act.

"[Congressman Dawson]: To give permission to amend their constitution.

"[Committee counsel]: I think that would help clarify the intent of the committee at the present time and of Congress if they favorably acted on the legislation." *Id.*, at 9.

The next day, July 16, the Committee filed its report on the substitute bill. H. R. Rep. No. 848, *supra.* The Report explains that § 6 would

"give consent of the United States to those States presently having organic laws expressly disclaiming jurisdiction to acquire jurisdiction subsequent to enactment by amending or repealing such disclaimer laws."

The Committee hearings thus make clear an intention to remove any federal barriers to the assumption of jurisdiction by Enabling Act States. They also make clear that that consent was not to effect an immediate transfer of jurisdiction.

[37] See June 29 Hearings 23; July 15 Hearings 6–11.

there is no indication that the Committee intended to impose any such requirement.[38]

We conclude that § 6 of Pub. L. 280 does not require disclaimer States to amend their constitutions to make an effective acceptance of jurisdiction. We also conclude that any Enabling Act requirement of this nature was effectively repealed by § 6. If as a matter of state law a constitutional amendment is required, that procedure must—as a matter of state law—be followed. And if under state law a constitutional amendment is not required, disclaimer States must still take positive action before Pub. L. 280 jurisdiction can become effective. The Washington Supreme Court having determined that for purposes of the repeal of Art. XXVI of the Washington Constitution legislative action is sufficient,[39] and appropriate state legislation having been enacted, it follows that the State of Washington has satisfied the procedural requirements of § 6.

## IV

We turn to the question whether the State was authorized under Pub. L. 280 to assume only partial subject-matter and geographic jurisdiction over Indian reservations within the State.[40]

---

[38] The House passed the bill without debate on July 27, 1953. 99 Cong. Rec. 9962–9963. In the Senate, the bill was referred to the Committee on Interior and Insular Affairs. *Id.*, at 10065. That Committee held no hearings of its own, and it reported out the bill two days later without amendment. *Id.*, at 10217. The bill received only brief consideration on the Senate floor before it was passed on August 1, 1953. *Id.*, at 10783–10784.

[39] The Tribe has intimated that the Washington Supreme Court's holding is incorrect. However, the procedure by which the disclaimer might be removed or repealed—Congress having given its consent—is as we have held a question of state law.

[40] Both parties find support for their positions on this issue in the legislative history of the amendments to Pub. L. 280 in Title IV of the Indian

The argument that Pub. L. 280 does not permit this scheme of partial jurisdiction relies primarily upon the text of the federal law. The main contention of the Tribe and the United States is that partial jurisdiction, because not specifically authorized, must therefore be forbidden. In addition, they assert that the interplay between the provisions of Pub. L. 280 demonstrates that § 6 States are required, if they assume any jurisdiction, to assume as much jurisdiction as was transferred to the mandatory States.[41]  Pointing out that 18 U. S. C. § 1151 defines Indian country for purposes of federal jurisdiction as including an entire reservation notwithstanding "the issuance of any patent," they reason that when Congress in § 2 transferred to the mandatory States "criminal jurisdiction" over "offenses committed by or against Indians in the Indian country," it meant that all parts of Indian country were to be covered.  Similarly, they emphasize that civil jurisdiction of comparable scope was transferred to the mandatory

Civil Rights Act of 1968, 82 Stat. 73.  The 1968 legislation provides that States that have not extended criminal or civil jurisdiction to Indian country can make future extensions only with the consent of the tribes affected.  25 U. S. C. §§ 1321 (a), 1322 (a).  The amendments also provide explicitly for partial assumption of jurisdiction.  *Ibid.*  In addition, they authorize the United States to accept retrocessions of jurisdiction, full or partial, from the mandatory and the § 7 States.  25 U. S. C. § 1323 (a).  Section 7 itself was repealed with the proviso that the repeal was not intended to affect any cession made prior to the repeal.  25 U. S. C. § 1323 (b).  Section 6 was re-enacted without change.  25 U. S. C. § 1324.

We do not rely on the 1968 legislation or its history, finding the latter equivocal, and mindful that the issues in this case are to be determined in accord with legislation enacted by Congress in 1953.

[41] Since entire reservations were exempted from coverage in three of the mandatory States, the Tribe and the United States concede that the option States could probably assume jurisdiction on a reservation-by-reservation basis.  The United States also concedes that the word "or" in § 7 might be construed to mean that option States need not extend both civil and criminal jurisdiction.

States. They stress that in both §§ 2 and 4, the consequence of state assumption of jurisdiction is that the state "criminal laws" and "civil laws of . . . general application" are henceforth to "have the same force and effect within . . . Indian country as they have elsewhere within the State." Finally, the Tribe and the United States contend that the congressional purposes of eliminating the jurisdictional hiatus thought to exist on Indian reservations, of reducing the cost of the federal responsibility for jurisdiction on tribal lands, and of assimilating the Indian tribes into the general state population are disserved by the type of checkerboard arrangement permitted by Chapter 36.

We agree, however, with the State of Washington that statutory authorization for the state jurisdictional arrangement is to be found in the very words of § 7. That provision permits option States to assume jurisdiction "in such manner" as the people of the State shall "by affirmative legislative action, obligate and bind the State to assumption thereof." Once the requirements of § 6 have been satisfied, the terms of § 7 appear to govern the scope of jurisdiction conferred upon disclaimer States. The phrase "in such manner" in § 7 means at least that any option State can condition the assumption of full jurisdiction on the consent of an affected tribe. And here Washington has done no more than refrain from exercising the full measure of allowable jurisdiction without consent of the tribe affected.

Section 6, as we have seen, was placed in the Act to eliminate possible organic law barriers to the assumption of jurisdiction by disclaimer States. The Tribe and the United States acknowledge that it is a procedural, not a substantive, section. The clause contains only one reference of relevance to the partial-jurisdiction question. This is the phrase "assumption of civil and criminal jurisdiction in accordance with the provisions of this Act." As both parties recognize, this phrase necessarily leads to other "provisions" of the Act for

clarification of the substantive scope of the jurisdictional grant. The first question then is which other "provisions" of the Act govern. The second is what constraints those "provisions" place on the jurisdictional arrangements made by option States.

The Tribe argues as an initial matter that § 7 is not one of the "provisions" referred to by § 6. It relies in part upon the contrast between the phrase "assumption of civil and criminal jurisdiction" in § 6 and the disjunctive phrase "criminal offenses or civil causes of action" in § 7. From this distinction between the "civil *and* criminal jurisdiction" language of § 6 and the optional language in § 7, we are asked to conclude that § 6 States must assume full jurisdiction in accord with the terms applicable to the mandatory States even though § 7 States are permitted more discretion. We are unable to accept this argument, not only because the statutory language does not fairly support it, but also because the legislative history is wholly to the contrary. It is clear from the Committee hearings that the States covered by § 6 were, except for the possible impediments contained in their organic laws, to be treated on precisely the same terms as option States.[42]

Section 6, as we have seen, was essentially an afterthought designed to accomplish the limited purpose of removing any barrier to jurisdiction posed by state organic law disclaimers of jurisdiction over Indians. All option States were originally treated under the aegis of § 7.[43] The record of the Committee hearings makes clear that the sole purpose of § 6 was to resolve the disclaimer problem.[44] Indeed, to the extent that the Tribe and the United States suggest that disclaimer States stand on a different footing from all other option States, their argument makes no sense. It would ascribe to Congress an

---

[42] See June 29 and July 15 Hearings.

[43] See *ibid.*

[44] See, *e. g.,* July 15 Hearings 4.

intent to require States that by force of organic law barriers may have had only a limited involvement with Indian country to establish the most intrusive presence possible on Indian reservations, if any at all, and at the same time an intent to allow States with different traditions to exercise more restraint in extending the coverage of their law.

The Tribe and the United States urge that even if, as we have concluded, all option States are ultimately governed by § 7, the reference in that section to assumption of jurisdiction "as provided for in [the] Act" should be construed to mean that the automatic-transfer provisions of §§ 2 and 4 must still apply. The argument would require a conclusion that the option States stand on the same footing as the mandatory States. This view is not persuasive. The mandatory States were consulted prior to the introduction of the single-state bills that were eventually to become Pub. L. 280. All had indicated their willingness to accept whatever jurisdiction Congress was prepared to transfer. This, however, was not the case with the option States. Few of those States had been consulted, and from the June 29 and July 15 hearings it is apparent that the drafters were primarily concerned with establishing a general transfer scheme that would facilitate, not impede, future action by other States willing to accept jurisdiction. It is clear that the all-or-nothing approach suggested by the Tribe would impede even the most responsible and sensitive jurisdictional arrangements designed by the States. To find that under Pub. L. 280 a State could not exercise partial jurisdiction, even if it were willing to extend full jurisdiction at tribal request, would be quite inconsistent with this basic history.

The language of § 7, which we have found applicable here, provides, we believe, surer guidance to the issue before us.[45]

---

[45] The 1968 amendments, which re-enacted § 6 without change as 25 U. S. C. § 1324 but repealed § 7, 25 U. S. C. § 1323 (b), and added substantive jurisdictional provisions covering "any State," see 25 U. S. C.

The critical language in § 7 is the phrase permitting the assumption of jurisdiction "at such time and in such manner as the people of the State shall . . . obligate and bind the State to assumption thereof." Whether or not "in such manner" is fully synonymous with "to such extent," the phrase is at least broad enough to authorize a State to condition the extension of full jurisdiction over an Indian reservation on the consent of the tribe affected.

The United States argues that a construction of Pub. L. 280 which permits selective extension of state jurisdiction allows a State to "pick and choose" only those subject-matter areas and geographical parts of reservations over which it would like to assume responsibility. Congress, we are told, passed Pub. L. 280 not as a measure to benefit the States, but to reduce the economic burdens associated with federal jurisdiction on reservations, to respond to a perceived hiatus in law enforcement protections available to tribal Indians, and to achieve an orderly assimilation of Indians into the general population. That these were the major concerns underlying the passage of Pub. L. 280 cannot be doubted. See *Bryan* v. *Itasca County*, 426 U. S., at 379.

But Chapter 36 does not reflect an attempt to reap the benefits and to avoid the burdens of the jurisdictional offer made by Congress. To the contrary, the State must assume total jurisdiction whenever a tribal request is made that it do so. Moreover, the partial geographic and subject-matter jurisdiction that exists in the absence of tribal consent is responsive to the law enforcement concerns that underlay the adoption of Pub. L. 280. State jurisdiction is complete as to all non-Indians on reservations and is also complete as to Indians on nontrust lands. The law enforcement hiatus that preoccupied the 83d Congress has to that extent been eliminated. On trust and restricted lands within the reservations

§§ 1321, 1322, suggest that in the future the scope of jurisdiction for all States is to be the same.

whose tribes have not requested the coverage of state law, jurisdiction over crimes by Indians is, as it was when Pub. L. 280 was enacted, shared by the tribal and Federal Governments. To the extent that this shared federal and tribal responsibility is inadequate to preserve law and order, the tribes need only request and they will receive the protection of state law.

The State of Washington in 1963 could have unilaterally extended full jurisdiction over crimes and civil causes of action in the entire Yakima Reservation without violating the terms of Pub. L. 280. We are unable to conclude that the State, in asserting a less intrusive presence on the Reservation while at the same time obligating itself to assume full jurisdictional responsibility upon request, somehow flouted the will of Congress. A State that has accepted the jurisdictional offer in Pub. L. 280 in a way that leaves substantial play for tribal self-government, under a voluntary system of partial jurisdiction that reflects a responsible attempt to accommodate the needs of both Indians and non-Indians within a reservation, has plainly taken action within the terms of the offer made by Congress to the States in 1953. For Congress surely did not deny an option State the power to condition its offer of full jurisdiction on tribal consent.

## V

Having concluded that Chapter 36 violates neither the procedural nor the substantive terms of Pub. L. 280, we turn, finally, to the question whether the "checkerboard" pattern of jurisdiction applicable on the reservations of nonconsenting tribes is on its face invalid under the Equal Protection Clause of the Fourteenth Amendment.[46] The Court of Ap-

---

[46] The Court of Appeals did not disturb the finding of the District Court that Chapter 36 had not been applied on the Yakima Reservation to discriminate against the Tribe or any of its members. The District Court found that the governmental legal services available to the Tribe and its

peals for the Ninth Circuit concluded that it is, reasoning that the land-title classification is too bizarre to meet "any formulation of the rational basis test." 552 F. 2d, at 1335. The Tribe advances several different lines of argument in defense of this ruling.

First, it argues that the classifications implicit in Chapter 36 are racial classifications, "suspect" under the test enunciated in *McLaughlin* v. *Florida*, 379 U. S. 184, and that they cannot stand unless justified by a compelling state interest. Second, it argues that its interest in self-government is a fundamental right, and that Chapter 36—as a law abridging this right—is presumptively invalid. Finally, the Tribe argues that Chapter 36 is invalid even if reviewed under the more traditional equal protection criteria articulated in such cases as *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307.[47]

We agree with the Court of Appeals to the extent that its opinion rejects the first two of these arguments and reflects a judgment that Chapter 36 must be sustained against an Equal Protection Clause attack if the classifications it employs "rationally furthe[r] the purpose identified by the State." *Massachusetts Bd. of Retirement* v. *Murgia, supra,* at 314. It is settled that "the unique legal status of Indian tribes under

members were not significantly different from those offered to other rural and city residents of Yakima County. It also concluded that the distinctions drawn between non-Indians and Indians in the statute were not motivated by a discriminatory purpose. In view of these findings, our inquiry here is limited to the narrow question whether the distinctions drawn in Chapter 36 on their face violate the Equal Protection Clause of the Fourteenth Amendment.

[47] The Court of Appeals limited its holding to the land-tenure classification. The Tribe, in support of the judgment, has argued that the Chapter 36 classifications based on the tribal status of the offender and on whether a juvenile is involved are also facially invalid. In our view these status classifications of Chapter 36 are indistinguishable from the interrelated land-tenure classification so far as the Equal Protection Clause is concerned.

federal law" permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive. *Morton* v. *Mancari,* 417 U. S. 535, 551–552. States do not enjoy this same unique relationship with Indians, but Chapter 36 is not simply another state law. It was enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians. The jurisdiction permitted under Chapter 36 is, as we have found, within the scope of the authorization of Pub. L. 280. And many of the classifications made by Chapter 36 are also made by Pub. L. 280. Indeed, classifications based on tribal status and land tenure inhere in many of the decisions of this Court involving jurisdictional controversies between tribal Indians and the States, see, *e. g., United States* v. *McBratney,* 104 U. S. 621. For these reasons, we find the argument that such classifications are "suspect" an untenable one. The contention that Chapter 36 abridges a "fundamental right" is also untenable. It is well established that Congress, in the exercise of its plenary power over Indian affairs, may restrict the retained sovereign powers of the Indian tribes. See, *e. g., United States* v. *Wheeler,* 435 U. S. 313. In enacting Chapter 36, Washington was legislating under explicit authority granted by Congress in the exercise of that federal power.[48]

The question that remains, then, is whether the lines drawn by Chapter 36 fail to meet conventional Equal Protection Clause criteria, as the Court of Appeals held. Under those criteria, legislative classifications are valid unless they bear no rational relationship to the State's objectives. *Massachusetts Bd. of Retirement* v. *Murgia, supra,* at 314. State legislation "does not violate the Equal Protection Clause merely because the classifications [it makes] are imperfect."

---

[48] This is not to hold that Pub. L. 280 was a termination measure. Whether there is concurrent tribal and state jurisdiction on some areas of the Reservation is an issue we do not decide. See n. 32, *supra.*

*Dandridge* v. *Williams,* 397 U. S. 471, 485. Under these standards we have no difficulty in concluding that Chapter 36 does not offend the Equal Protection Clause.

The lines the State has drawn may well be difficult to administer. But they are no more or less so than many of the classifications that pervade the law of Indian jurisdiction. See *Seymour* v. *Superintendent,* 368 U. S. 351; *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463. Chapter 36 is fairly calculated to further the State's interest in providing protection to non-Indian citizens living within the boundaries of a reservation while at the same time allowing scope for tribal self-government on trust or restricted lands. The land-tenure classification made by the State is neither an irrational nor arbitrary means of identifying those areas within a reservation in which tribal members have the greatest interest in being free of state police power. Indeed, many of the rules developed in this Court's decisions in cases accommodating the sovereign rights of the tribes with those of the States are strikingly similar. See, *e. g., United States* v. *McBratney, supra; Draper* v. *United States,* 164 U. S. 240; *Williams* v. *Lee,* 358 U. S. 217; *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164. In short, checkerboard jurisdiction is not novel in Indian law, and does not, as such, violate the Constitution.

For the reasons set out in this opinion, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

For over 140 years, the Court has resolved ambiguities in statutes, documents, and treaties that affect retained tribal sovereignty in favor of the Indians.[1] This interpretive prin-

---

[1] *E. g., Worcester* v. *Georgia,* 6 Pet. 515, 580–582 (1832) (McLean, J., concurring); *The Kansas Indians (Wan-zop-e-ah* v. *Board of Comm'rs*

ciple is a response to the unique relationship between the Federal Government and the Indian people, "who are the wards of the nation, dependent upon its protection and good faith." *Carpenter* v. *Shaw*, 280 U. S. 363, 367 (1930). More fundamentally, the principle is a doctrinal embodiment of "the right of [Indian nations] to make their own laws and be ruled by them," *Williams* v. *Lee*, 358 U. S. 217, 220 (1959), a right emphatically reaffirmed last Term in *United States* v. *Wheeler*, 435 U. S. 313, 322–330 (1978). Although retained tribal sovereignty "exists only at the sufferance of Congress," *id.*, at 323, the States may not encroach upon an Indian nation's internal self-government until Congress has unequivocally sanctioned their presence within a reservation. See *ibid.*; *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 168–169, 172–173); *Worcester* v. *Georgia*, 6 Pet. 515, 554, 557, 561 (1832); see also *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191, 212 (1978) (MARSHALL, J., dissenting).

While the Court in its discussion of the disclaimer issue professes to follow this settled principle of statutory interpretation, *ante*, at 484, it completely ignores the rule when addressing Washington's assertion of partial jurisdiction. In my view, the language and legislative history of Pub. L. 280 do not unequivocally authorize States to assume the type of selective geographic and subject-matter jurisdiction that Washington asserted in 1963.[2] Because our precedents compel

---

of the County of Miami), 5 Wall. 737, 760 (1867); *Jones* v. *Meehan*, 175 U. S. 1, 11–12 (1899); *Cherokee Intermarriage Cases*, 203 U. S. 76, 94 (1906); *Choate* v. *Trapp*, 224 U. S. 665, 675 (1912); *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89 (1918); *Carpenter* v. *Shaw*, 280 U. S. 363, 366–367 (1930); *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 353–354 (1941); *Squire* v. *Capoeman*, 351 U. S. 1, 6–7 (1956); *Menominee Tribe of Indians* v. *United States*, 391 U. S. 404, 406 n. 2 (1968); *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 173–175, and n. 13 (1973); *Bryan* v. *Itasca County*, 426 U. S. 373, 392–393 (1976).

[2] Since I would invalidate Washington's jurisdictional arrangement on this ground, I need not address the disclaimer issue. For present pur-

us to construe the statute in favor of the Indians, I respectfully dissent.

As is evident from the majority opinion, the text of Pub. L. 280 does not on its face empower option States to assert partial geographic or subject-matter jurisdiction over Indian reservations.[3] The statute refers without limitation to "criminal" and "civil" jurisdiction. Nevertheless, because option States could have conditioned their exercise of full jurisdiction on the consent of affected tribes, *ante,* at 495, 498, and because Pub. L. 280 would have permitted Washington to extend full jurisdiction over the Yakima Indian Reservation without consulting the Tribe, *ante,* at 499, the Court concludes that the States can unilaterally assert less than full jurisdiction.

I agree that Pub. L. 280 permits option States to refuse jurisdiction absent the consent of the Indians, and that prior to the 1968 amendments of the Act,[4] Washington could have unilaterally extended full jurisdiction over the Reservation. But the majority does not explain how the statutory language governing exercise of *full* jurisdiction allows the States to exercise piecemeal jurisdiction. That Washington has done no more than "refrain from exercising the full measure of allowable jurisdiction," *ante,* at 495, raises but does not answer

poses I will assume that Washington was not required to amend its constitutional disclaimer of authority over Indian lands before it could exercise power over the Reservation.

[3] It may be that the disjunctive language of § 7 allows option States to exercise either criminal or civil jurisdiction. See *ante,* at 496–497, and n. 41. And perhaps extension of jurisdiction reservation by reservation is also permissible. See *ante,* at 494 n. 41. But neither of these questions is posed by this case. The issue presented here is whether the language of Pub. L. 280 authorizes any patchwork jurisdictional arrangement that suits the States' peculiar interests.

[4] These amendments prohibit States from exercising further jurisdiction over Indian reservations after 1968 without tribal consent. 25 U. S. C. §§ 1321 (a), 1322 (b), 1326.

the critical question whether Pub. L. 280 sanctions this jurisdictional arrangement.

The sparse legislative history of Pub. L. 280, like the statutory language, says nothing about the propriety of partial jurisdictional schemes. In light of the expressed reluctance of at least one State to assume the financial burden that jurisdiction over Indian territory entails,[5] this silence is particularly instructive. Although selective assertion of jurisdiction within reservations would obviously ameliorate such fiscal concerns, at no point in the congressional deliberations was it advanced as a solution. Rather, Congress permitted the option States to refrain from exercising full jurisdiction until they could meet their financial obligations.[6] The legislative focus was clearly on full-fledged assumption of jurisdiction.[7]

To disregard this legislative focus and allow assumption of partial jurisdiction undermines an important purpose behind Pub. L. 280. In enacting the statute, Congress sought to eliminate the serious "hiatus in law-enforcement authority" on Indian reservations, H. R. Rep. No. 848, *supra* n. 5, at 6, which was attributable in large part to the division of law enforcement functions among federal, state, and Indian authorities.[8] It intended to accomplish this goal by granting

---

[5] See Hearings on H. R. 1063 before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 8–10, 14–15 (1953) (hereinafter 1953 Subcommittee Hearings); Hearings on H. R. 1063 before the House Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 3, 7, 13, 17 (1953) (hereinafter 1953 Committee Hearings); H. R. Rep. No. 848, 83d Cong., 1st Sess., 7 (1953).

[6] See 1953 Committee Hearings 13; H. R. Rep. No. 848, *supra*, at 6–7.

[7] See, *e. g.*, 1953 Subcommittee Hearings 3, 4, 5, 7, 17; 1953 Committee Hearings 3, 8; 99 Cong. Rec. 10782–10783 (1953) (statement of Sen. Thye; letter from Gov. Anderson to Sen. Thye).

[8] See H. R. Rep. No. 848, *supra*, at 5–6; 1953 Subcommittee Hearings 2–3, 21–22; Hearings on H. R. 459, H. R. 3235 and H. R. 3624 before the Subcommittee on Indian Affairs of the House Committee on Interior and

to the States the authority previously exercised by the Federal Government, thereby simplifying the administration of law on Indian reservations. See 1953 Subcommittee Hearings 7. Washington's complex jurisdictional system, dependent on the status of the offender, the location of the crime, and the type of offense involved, by no means simplifies law enforcement on the Yakima Reservation. Cf. 1 National American Indian Court Judges Assn., Justice and the American Indian: The Impact of Public Law 280 upon the Administration of Justice on Indian Reservations 6–13 (1974). To the contrary, it exacerbates the confusion that the statute was designed to redress.

Had Congress intended to condone exercise of limited subject-matter jurisdiction on a random geographic basis, it could have easily expressed this purpose. See *Bryan* v. *Itasca County,* 426 U. S. 373, 392–393 (1976); *Mattz* v. *Arnett,* 412 U. S. 481, 504–505 (1973); *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S., at 173–175, and n. 13; *Menominee Tribe of Indians* v. *United States,* 391 U. S. 404, 412–413 (1968); *Creek County Comm'rs* v. *Seber,* 318 U. S. 705, 713 (1943). Indeed, it did so in the 1968 amendments to the Act when it authorized partial criminal or civil jurisdiction by subject matter, geography, or both, but only with the Indians' consent. 25 U. S. C. §§ 1321 (a), 1322 (a).[9]  I am unwilling to

---

Insular Affairs, 82d Cong., 2d Sess., 14 (1952) (statement of Rep. D'Ewart); Goldberg, Public Law 280: The Limits of State Jurisdiction Over Reservation Indians, 22 UCLA L. Rev. 535, 541–543 (1975).

[9] The legislative history of the 1968 amendments provides further evidence that Congress in 1953 did not unambiguously sanction assertion of selective jurisdiction. There were numerous conflicting opinions on whether the new provisions authorizing States to assume partial jurisdiction effected a change in the law. In 1965, the Department of the Interior had intimated that partial assumption of criminal jurisdiction was a novel idea when it recommended partial jurisdiction in civil matters, but concluded that "extension of criminal jurisdiction to the States on a piecemeal basis needs to be considered further." Hearings on Constitutional Rights of the American Indian before the Subcommittee on Constitutional

presume that Congress' failure in 1953 to sanction piecemeal jurisdiction in similar terms was unintentional. In any event, it is indisputable that the statute does not unambiguously authorize assertion of partial jurisdiction. If we adhere more than nominally to the practice of resolving ambiguities in favor of the Indians, then Washington's jurisdictional arrangement cannot stand.

Accordingly, I dissent.

---

Rights of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 321 (1965) (letter from Frank J. Barry, Acting Secy. of the Interior, to Sen. Eastland). This letter also noted that the Department of Justice was opposed to selective extensions of criminal jurisdiction because of the likelihood of unnecessary confusion in the enforcement of criminal laws. *Ibid.*

However, in 1968, Assistant Secretary of the Interior Harry R. Anderson believed that authority to assume piecemeal jurisdiction was implicit in Pub. L. 280. Hearings on H. R. 15419 and Related Bills before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 90th Cong., 2d Sess., 25 (1968) (letter to Rep. Wayne N. Aspinall). By contrast, Congressman Aspinall, who played a fundamental role in drafting Pub. L. 280, stated that the new partial-jurisdiction provisions substantially altered prior law. 114 Cong. Rec. 9615 (1968). Similarly, Arthur Lazarus, an attorney representing six Tribes, argued that "[o]ne of the major objections to Public Law 280 is its 'all or nothing' approach, requiring States to assume all jurisdiction on Indian reservations if any jurisdiction is desired." 1968 Hearings, *supra*, at 116. Deputy Attorney General Warren Christopher was noncommittal on the reading of prior law. *Id.,* at 28 (letter to Rep. Aspinall).

This subsequent legislative consideration of the precise issue before us sheds light on the intent of Congress in 1953. See *Mattz* v. *Arnett,* 412 U. S. 481, 505 n. 25 (1973); *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463, 472–475 (1976); *Bryan* v. *Itasca County,* 426 U. S., at 386. Given the congressional and executive equivocation, the Court's apparent certainty is unfounded.