STATE of South Dakota, Plaintiff
and Appellee,

v.

Peter SPOTTED HORSE, Jr.,
Defendant and Appellant.

No. 16644.

Supreme Court of South Dakota.

Argued Jan. 9, 1990.

Decided Oct. 4, 1990.

John P. Guhin, Deputy Atty. Gen., Roger A. Tellinghuisen, Atty. Gen. (on brief), Pierre, for plaintiff and appellee.

Randolph J. Seiler of Seiler & Cain, Mobridge, for defendant and appellant.

MORGAN, Justice.

Peter Spotted Horse, Jr. (Spotted Horse) appeals[1] a judgment rendered on a jury verdict convicting him of driving while under the influence of an alcoholic beverage (DUI) and failure to display current registration. We affirm in part and reverse and remand in part.

## FACTS

On April 1, 1988, Spotted Horse, an enrolled member of the Standing Rock Sioux Tribe who resided on the reservation, was driving off the reservation in the town of Mobridge, South Dakota. His car was not displaying valid 1988 license plate stickers, in violation of SDCL 32–5–98 (a Class 2 misdemeanor). Seeing this violation, Mobridge City Police Officer Roger Krone (Krone) attempted to stop the vehicle by turning on the red revolving light on top of his patrol car. This attempted stop occurred within the boundaries of the municipality of Mobridge.

Spotted Horse did not stop. Instead, he drove across the Missouri River bridge and onto the Standing Rock Sioux Reservation (reservation). Krone continued the pursuit with his siren running and red light flashing. The chase reached speeds ranging from 90 mph to 109 mph.[2] Spotted Horse

---

1. The Standing Rock Sioux Tribe filed an amicus curiae brief in support of Spotted Horse.

2. Justice Dunn, concurring specially in *State v. Seidschlaw*, 304 N.W.2d 102, 107–08 (S.D.1981), expressed well our opinion about these high-speed chases over minor traffic offenses.

"I realize that in the presence of a violation of the law it is the duty of an officer to take steps to suppress the offense and apprehend the violator; however, this must be done within the limits of rationality. Here the acts of these officers has brought them to the very

proceeded north on Highway 1806, driving seven or eight miles onto the reservation. Spotted Horse then turned off of Highway 1806 and drove within the city limits of the town of Wakpala, then into a housing area, and onto a private driveway or yard. Krone continued following Spotted Horse the entire time, never losing sight of him.

Once Krone exited his police car, Spotted Horse began to drive away again. Krone ran to the vehicle, reached inside and shut off the ignition. There were two adults and two children in the car. Krone informed Spotted Horse that he did not have "current [license] plates" on his car and told him numerous times to get out of the car. Spotted Horse refused. Krone started pulling on Spotted Horse's arm to extract him from the car. The ensuing struggle went on for anywhere from five to fifteen minutes during which time Krone struck Spotted Horse three or four times with his nightstick, several of the blows hitting Spotted Horse in the head and cheek. Finally, Krone pulled Spotted Horse from the car by his hair or his left shoulder and upper arm, threw him to the ground on his stomach, put his knee on his back and handcuffed him. Following the handcuffing, Krone lifted Spotted Horse by the arms and placed him in the police car.

Spotted Horse was then taken back to Mobridge. On the ride back, Krone noticed the smell of alcohol on Spotted Horse's breath. After arriving back at the station in Mobridge, Krone administered the field sobriety test to Spotted Horse, which he failed. Following the test, Krone arrested Spotted Horse for DUI and read him the implied consent warnings. Spotted Horse agreed to take a blood test and was taken to the Mobridge Hospital for the extraction of blood. The BAC was 0.244.

Spotted Horse was charged with five counts: (1) eluding police in violation of SDCL 32–33–18 (Class 1 misdemeanor); (2) driving while under the influence in violation of SDCL 32–23–1 (Class 1 misdemeanor); (3) resisting arrest in violation of SDCL 22–11–4 (Class 1 misdemeanor); (4) driving without a license in violation of SDCL 32–12–22 (Class 2 misdemeanor); and (5) failure to display current registration in violation of SDCL 32–5–98 (Class 2 misdemeanor). After a jury trial, Spotted Horse was convicted of Counts 2 and 5, driving under the influence and failure to display current registration. He was acquitted of Counts 1 and 3, eluding police and resisting arrest.[3]

## ISSUES

1. Did the trial court err in ruling that the State had jurisdiction to try an Indian who committed a misdemeanor off the reservation, but who fled to the reservation and was arrested by a municipal police officer on the reservation?

2. Did the trial court abuse its discretion in not suppressing evidence of unrelated crimes where the defendant alleged use of excessive force in making the arrest?

3. Did the trial court abuse its discretion in failing to suppress the blood test given to defendant because the blood was extracted by an LPN with expanded training?

## ANALYSIS

 We begin by discussing the appropriate standard of review. The jurisdictional challenge raised by this appeal involves the application and effect of SDCL 1–1–18 and 1–1–21, and procedural compliance with Public Law 280. Because issues regarding the removal of constitutional disclaimers of state jurisdiction are questions of state law, they are reviewed de novo by this court. *See Brown v. Egan Consol. School Dist. # 50–2,* 449 N.W.2d 259 (S.D. 1989); *Beville v. University of S.D. Bd. of Regents,* 420 N.W.2d 9 (S.D.1988). However, the question of substantive compliance with PL 280, *i.e.,* the validity of retrocession of PL 280 jurisdiction, is a question of federal law. *Tyndall v. Gunter,* 840 F.2d 617, 618 (8th Cir.1988). With these

---

edge of this precipice of rationality and may even have plunged them over that edge."

**3.** The fourth charge, driving without a license, was dismissed during trial.

standards in mind, we begin with Spotted Horse's argument that State lacked jurisdiction to make arrests on the reservation.

### 1. Jurisdiction

■ To understand our ultimate conclusion, it is necessary to briefly retrace the intermittent nature of state jurisdiction over reservations. In 1953, Congress passed Public Law 280,[4] which gave disclaimer[5] states, such as South Dakota, statutory power to assume and exercise civil and criminal jurisdiction over reservations if they passed legislation to accept jurisdiction. *State v. Onihan*, 427 N.W.2d 365, 367 (S.D.1988). Though South Dakota made efforts to pass legislation in 1957 and 1959 to fulfill this mandate, the legislation was ultimately ineffective. *See In re High Pine*, 78 S.D. 121, 99 N.W.2d 38 (1959); 1951 S.D. Sess. L. ch. 187; 1957 S.D. Sess. L. ch. 319; 1959 S.D. Sess. L. ch. 144, §§ 1, 2.

Then, in 1961, South Dakota passed SDCL 1–1–18[6] and SDCL 1–1–21,[7] wherein the legislature conditioned acceptance of civil and criminal jurisdiction on federal reimbursement. An exception was provided, however, whereby the State assumed jurisdiction over criminal offenses and civil causes of action on the highways without the requirement of federal reimbursement. The validity of this legislation is the lynchpin of this decision. Following the 1961 legislation, we held that these statutes were ineffective because the State could not assume partial jurisdiction over Indian country. *See In re Hankins*, 80 S.D. 435, 125 N.W.2d 839 (1964). We then changed course for partial jurisdiction on the highways in *Onihan, supra*, after the United States Supreme Court held that the state of Washington had validly assumed partial jurisdiction over reservations in the case of *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979).

Now, we must reconsider our position again in light of the decision of the United States Court of Appeals in *Rosebud Sioux Tribe v. South Dakota*, 900 F.2d 1164 (8th Cir.1990). *Rosebud* reversed the district court's decision which had sustained the state's exercise of jurisdiction over highways running through reservations in the state, on two principal grounds. First, the 1961 legislation did not validly retrocede jurisdiction to the State within the terms of PL 280. The *Rosebud* court found that our decision in *Onihan* had misinterpreted *Yakima*, thereby improperly overruling the *Hankins* decision that the State lacked PL 280 jurisdiction. Speaking of the differences between the assumption of jurisdiction in *Yakima* versus our legislature's actions, the Eighth Circuit stated:

> The major concerns reflected in the passage of PL 280 were (1) to reduce the economic burden of federal jurisdiction

---

**4.** Act of August 15, 1953, ch. 505, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 28 U.S.C. § 1360 (1976)).

**5.** The term "disclaimer state" designates those states which had constitutions or statutes containing organic law disclaimers of jurisdiction over Indian country. *State v. Onihan*, 427 N.W.2d 365, 367 (S.D.1988).

**6.** 1961 S.D. Sess. L. ch. 464, § 1. SDCL 1–1–18 provides:

> The state of South Dakota, in accordance with the provisions of 67 Statutes at Large, page 589 (Public Law 280), hereby assumes and accepts jurisdiction of all criminal offenses and civil causes of action arising in the Indian country located within this state, as Indian country is defined by Title 18 United States Code, section 1151, and obligates and binds this state to the assumption thereof, the provisions of chapter 106 of the Session Laws of the state of South Dakota for 1901, as amended, or any other law of this state to the contrary, notwithstanding.

**7.** 1961 S.D. Sess. L. ch. 464, § 4. SDCL 1–1–21 provides:

> Except as to criminal offenses and civil causes of action arising on any highways, as the term is defined in chapter 31–1, the jurisdiction provided for in § 1–1–18 shall not be deemed assumed or accepted by this state, and §§ 1–1–18 and 1–1–20 shall not be considered in effect, unless and until the Governor of the state of South Dakota, if satisfied that the United States of America has made proper provision for the reimbursement to this state and its counties for the added costs in connection with the assumption of said jurisdiction, has issued his proper proclamation duly filed with the secretary of state declaring the said jurisdiction to be assumed and accepted.

over reservations, (2) to respond to a perceived hiatus in law enforcement on reservations, and (3) to assimilate Indians into the general population. *Yakima*, 439 U.S. at 498 [99 S.Ct. at 760]. We believe South Dakota's limited excursion into the area of Indian jurisdiction is not responsive to the concerns underlying the passage of PL 280. Jurisdiction over highways does not go very far in reducing lawlessness on reservations, but simply introduces a third party to the already complex jurisdiction pattern on reservations. It also does little to reduce federal presence on reservations since the federal government retains the financial burden of the majority of jurisdictional concerns. The Washington statute, which left open the possibility of complete jurisdiction upon tribal consent, reflected an acceptance of the burden of jurisdiction, as well as an attempt to accommodate tribal self-governance. The state's partial jurisdiction assumption here represents the contrary result. We believe that the failure to assume jurisdiction in a manner consistent with the purposes of PL 280 is not sufficient "action within the terms of the offer made by Congress to the States in 1953."

900 F.2d at 1170–71 (footnotes omitted).

Second, the Eighth Circuit found that Congress, by amending PL 280 in 1968[8] and requiring tribal consent to any new assumption of jurisdiction, vested the interests of the tribes in self-government and precluded South Dakota from enforcing its 1961 legislation because it was improper to apply *Yakima* retroactively. The court explained:

The Tribes, particularly in South Dakota, have relied on the protection offered by the tribal consent amendment since 1968. The Tribes have co-existed with state authorities with the knowledge that the state could not assume jurisdiction over them without their consent. The state allowed federal and tribal authorities to exercise jurisdiction prior to and after 1968 without asserting its claim to juris-

diction. Retroactive application of the *Yakima* interpretation of PL 280 to revive South Dakota's 1961 legislation would disregard the manner in which the Tribes and the state have structured their jurisdictional relationship.

. . . . .

[T]he congressional intent in passing the 1968 amendment did not contemplate that a subsequent, retroactive application of a change in statutory interpretation could alter South Dakota's lack of jurisdiction existing at the time of the repeal of section 7.

900 F.2d at 1173, 1174. Accordingly, South Dakota does not have jurisdiction over Indian country, nor may the State exercise partial jurisdiction over highways running through the reservations.

■ Since South Dakota had no jurisdiction on the reservation, our fresh pursuit statute could not reach onto the reservation and we are left with the question: What effect did Krone's incursion onto the reservation have on the trial of Spotted Horse?

■ We first consider Spotted Horse's argument that the trial court lacked jurisdiction to try him on the charges. He acknowledges our holding in *State v. Winckler*, 260 N.W.2d 356 (S.D.1977), where we said:

When a person accused of a crime is found within the territorial jurisdiction wherein he is so charged and is held under process legally issued from a court of that jurisdiction, neither the jurisdiction of the court nor the right to put him on trial for the offense charged is impaired by the manner in which he was brought from another jurisdiction, whether by kidnapping, illegal arrest, abduction, or irregular extradition proceedings.

*Id.* at 363 (citing 4 Wharton's Criminal Procedures § 1484, at 39–40 (1957)). This rule, the Ker–Frisbie rule, is an adaptation of

---

**8.** Act of April 11, 1968, Pub.L. 90–284, Title IV, § 403, 82 Stat. 79 (codified at 25 U.S.C. § 1323 (1983)).

the rules of *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) and *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), originally adopted by this court in an earlier decision, *State v. Thundershield,* 90 S.D. 391, 399, 242 N.W.2d 159, 163–64 (1976). Spotted Horse urges us to reexamine our holding in *Winckler* in light of the authority found in *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974).

In *Winckler* the offense charged, assault with a dangerous weapon without intent to kill, was committed by the Indian defendants firing guns from trust land at officers who were outside the trust land. The defendants surrendered to an officer of the B.I.A. police, who then simply turned them over to State authorities for prosecution. In comparison, the defendant in *Toscanino* alleged that he was kidnapped in Uruguay by American agents, tortured, and abducted to the United States for the purpose of prosecution here. The *Winckler* decision referred to our *Thundershield* decision and eschewed *Toscanino.* *Thundershield* involved an extradition technicality, a purely statutory violation, not claimed to be of constitutional dimension.

More recently we applied the same rule in *Quiver v. State,* 339 N.W.2d 303, 305 (S.D.1983), referring to it as the *Ker* rule. In *Quiver,* no Indian jurisdiction was involved; rather it was a question of procedurally incorrect extradition from Nebraska.

In the context of Indian jurisdiction cases, the rule found in *Ker* and *Frisbie* was criticized by the New Mexico Supreme Court in *Benally v. Marcum,* 89 N.M. 463, 553 P.2d 1270 (1976). Citing *Toscanino,* the decision first noted the expansion of the concept of due process to protect the accused against pretrial illegality. The decision went on to point out how the Navajo tribe "has provided specific procedures for extraditing persons accused of crime from the reservation" and the Navajo tribal government's exercise of the sovereign power vested in them. 89 N.M. at 467, 553 P.2d at 1274.

Although we find Spotted Horse's case can be factually distinguished from *Thun-*dershield, *Winckler* and *Quiver,* and it is a very close case based on the actions of the police officer, we are not persuaded to abandon our rule at this time. Even though Krone chased defendant at breakneck speeds which were unwarranted considering the nature of the violation (expired license plate stickers), and engaged in a battle using his night stick, his actions cannot be equated with torture. No doubt, in pursuing Spotted Horse, Krone was relying, to some degree, on our decision in *Onihan.* Further, because the record reflects that the Standing Rock Sioux Tribe has not enacted into their tribal code any provisions for extradition, we are left with the firm conviction that, at least for the present, we should retain our established rule. Thus, we hold that the trial court had jurisdiction over Spotted Horse for the purpose of trial.

In arriving at this decision, we are also aware of the discussion in *Toscanino, supra,* wherein the court discussed the development of the concept of due process "which now protects the accused against pretrial illegality by denying to the government the fruits of its exploitation of any deliberate and unnecessary lawlessness on its part." 500 F.2d at 275. The court went on to point out:

> Although the issue in most of the cases forming part of this evolutionary process was whether evidence should have been excluded (e.g., *Mapp, Miranda, Wong Sun, Silverman* ), it was unnecessary in those cases to invoke any other sanction to insure that an ultimate conviction would not rest on governmental illegality.

*Id.*

We then examine the correlative issue, whether the evidence, particularly the field sobriety test and the blood test results, resulting from Spotted Horse's arrest were admissible at trial. Although Spotted Horse raises no issue on the admissibility of the field sobriety tests, and only challenges the admission of the blood tests on statutory grounds regarding the drawing of the blood sample, we review this very important issue under the doctrine of

plain error. SDCL 23A–44–15. Under the doctrine of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the exclusionary rule generally makes inadmissible against the defendant evidence that is the product of an unconstitutional arrest. As the court explained in *Wong Sun*, the purpose of the rule is to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person. The exclusionary prohibition extends to indirect as well as direct evidence; physical tangible materials obtained either during or as a direct result of an unlawful invasion, come at by exploitation of the illegal search; and testimony of matters observed during an unlawful invasion to enforce the basic constitutional policies. The seizure of Spotted Horse by Krone was clearly a violation of Spotted Horse's Fourth Amendment rights, thus suppression would seem to be automatic. However, there are some jurisdictions which have made some distinctions whereby the admission of such evidence has been permitted.

In *People v. Wolf*, 635 P.2d 213 (Colo. 1981), the Denver police made a stakeout and arrest in an adjoining county, beyond their jurisdiction, collected evidence, and turned the case over to the local authorities for prosecution. The Colorado Supreme Court determined that the police had the power to make a citizen's arrest where probable cause existed. The court went on, however, to caution that in cases where the police act in willful disobedience of the law, the courts have not hesitated to use their supervisory powers to exclude evidence. *Id.* at 217.

Here, Krone was not in the process of making a citizen's arrest, assuming such an arrest is possible under tribal ordinances. The violation for which he was initially and principally making the arrest, failure to display current vehicle registration, was not even an offense triable on the reservation. With respect to the DUI offense, Krone did not follow proper procedures. He transported Spotted Horse back to Walworth County for trial rather than turn him over to tribal authorities. Likewise, in *City of Kettering v. Hollen*, 64 Ohio St.2d 232, 416 N.E.2d 598 (1980), the Ohio Supreme Court, in a rather shallow opinion, determined that the exclusionary rule was not applicable to a DUI defendant arrested by a Kettering police officer in adjoining Dayton. The officer was engaged in hot pursuit. Nevertheless, the court assumed from an insufficient record that the arrest was unauthorized. The court held that the exclusionary rule, applicable for violations of a constitutional nature only, would not be applied to evidence which is the product of police conduct violative of *state law*, but not violative of constitutional rights. *Id.* 416 N.E.2d at 600. Because we view Krone's actions in pursuing Spotted Horse down the reservation highway, into the housing area and onto his front lawn to be a constitutional violation, far above simple statutory violations, we hold that the evidence attained by the unconstitutional arrest is not admissible against Spotted Horse. We therefore reverse the conviction for driving under the influence.

■ However, since the failure to display current registration offense was committed off the reservation, and independent evidence was obtained through Krone's observation before the illegal arrest, we affirm the verdict on this offense. *Winckler*, *supra* (manner of arrest, even including illegal arrest on reservation, does not bar prosecution).

That issue decided, we feel compelled to comment on the need for a solution to this gap in criminal jurisdiction. When a crime is committed off the reservation and criminals can flee unimpeded onto the reservation, both Indians and non-Indians alike are harmed. We would hope that in this year which the Governor has proclaimed "The Year of Reconciliation," that both tribal leaders and governmental officials will sit down and work out treaties that will remedy this situation.

### 2. Suppression of Evidence

Next, because Spotted Horse's conviction on expired license plates is preserved, we consider his argument that Krone's use of excessive force in making the arrest was a

violation of SDCL 23A–3–5 [9] and required suppression of evidence on *all* charges or, in the alternative, a jury instruction providing that an illegal arrest provided a defense to *all* the charges.

■ Before we may reverse the trial court on a motion to suppress, Spotted Horse must demonstrate that the trial court abused its discretion in not suppressing the evidence. *State v. Bartlett,* 411 N.W.2d 411, 414 (S.D.1987). Spotted Horse fails to meet this burden.

■ We begin by noting that there is a paucity of evidence that supports Spotted Horse's contention that he was brutally beaten. Also, Spotted Horse conveniently does not mention his resistance in leaving his car. Faced with this dearth of evidence, the trial court did not abuse its discretion in refusing to give the instruction or suppressing the evidence. *Bartlett, supra.* Furthermore, we can find no precedent for an exclusionary rule that would extend suppression of evidence to *unrelated* offenses and the cases cited by Spotted Horse certainly do not warrant this conclusion.

Contrary to Spotted Horse's contention, *State v. Gage,* 302 N.W.2d 793 (S.D.1981), merely stands for the proposition that insufficient information in an affidavit for a warrant deprived the police of probable cause and thereby makes an arrest illegal. As we noted earlier, even though the arrest on the reservation was illegal, that does not prevent prosecution on the failure to display current registration sticker offense. *Winckler, supra.*

Nor does *Brown v. Wyman,* 224 Mich. 360, 195 N.W. 52 (1923), stand for the proposition that excessive force invalidates an arrest. *Brown* is a civil case that awarded civil damages to a plaintiff who was struck in the face with a black jack by a sheriff making an arrest. Instead of supporting Spotted Horse's argument, *Brown* points to Spotted Horse's proper remedy—a civil suit for damages, not application of the exclusionary rule.

Nor is *State v. Rich,* 417 N.W.2d 868 (S.D.1988), support for creation of a new exclusionary rule. *Rich* involved an assault by a private citizen and the availability to the defendant of the privilege of self-defense or defense of another. Nothing within the decision supports this novel expansion of the exclusionary rule that Spotted Horse now urges.

Finally, contrary to Spotted Horse's argument, *United States ex rel. Means v. Solem,* 646 F.2d 322 (8th Cir.1980), stands only for the proposition that a defendant may be entitled to a self-defense instruction or defense of others in a riot situation if excessive force is used. It does not stand for, nor can we find, any precedent that states that a defendant is entitled to an acquittal on *unrelated* charges if excessive force is used during an arrest. Sufficient deterrence to police misconduct is provided if the excessive force invalidates a resisting arrest charge. Further, Spotted Horse would be entitled to pursue civil remedies against the officer. These two factors together provide a more than sufficient remedy for this type of conduct.

Because we have suppressed the blood test as the fruits of an illegal arrest, Spotted Horse's third issue is moot.

## DECISION

Therefore, we reverse the trial court on the conviction for DUI and affirm on the conviction for failure to display current registration and instruct the trial court to enter an order in conformity with this opinion.

MILLER, C.J., and WUEST and SABERS, JJ., concur.

HENDERSON, J., concurs specially.

HENDERSON, Justice (specially concurring).

As one reads through the thread of the majority opinion, it becomes obvious that this Court, and thus this State, is enlightening itself by (a) having its decisions re-

---

9. SDCL 23A–3–5 provides, in pertinent part: "No person shall subject an arrested person to more physical restraint than is reasonably necessary to effect the arrest[.]"

versed and (b) finally recognizing that there is a tribal sovereignty concept which spreads across the reservations, not only in South Dakota, but across this nation.

To have condoned this officer's jurisdiction, on a private driveway, where the defendant was arrested, would be granting authority unto law enforcement officers in this state defying the recognition of tribal sovereignty and independence. Such recognition would simply cause the mandates of Public Law 280 to be a nullity. Therefore, I concur in the majority's holding reversing the DUI conviction.

As I concur in this opinion, I call attention to my special concurrence in *State v. Onihan*, 427 N.W.2d 365 (S.D.1988):

> As one continues to struggle in reading the law, it is perceived that gradations of jurisdiction exist, not to mention variances, as the type of Indian jurisdiction cases surface in the appellate bodies. Specifically, in this type of case, basic questions should be asked: Does this case involve tort law? Family law? Criminal law? If the latter, does the case pertain to one of the major crimes? *See* 18 U.S.C. § 1153. Or are we just considering a minor crime? An analysis must further encompass the specific situs of the facts giving rise to the litigation. One must consider: Are the parties Indian or non-Indian? Does the Indian Child Welfare Act apply? Two authors, Davis H. Getches and Charles F. Wilkinson, in their treatise, Federal Indian Law (2d ed. 1986), write that the jurisdictional maze in criminal cases can be "walked with some confidence" when an analytical approach is followed. *Supra*, at 412. Briefly, their analysis contains these steps:
>
> 1. Was the locus of the crime in Indian Country?

> 2. Does Public Law 280 or a specific jurisdictional statute apply? Here, Public Law 280 is governing.
> 3. Was the crime committed by or against an Indian?
> 4. Which Defendant–Victim category applies? This question includes "victimless" and "consensual" crimes.

*See Federal Indian Law, supra*, at 412–15.

This point I try to make: Jurisdiction depends upon many factors. History of the particular reservation involved,[1] as well as legislative enactments of the particular state, likewise play a vital role. Each case must be scrutinized to determine where jurisdiction lies. Indian jurisdiction is a complex subject and is not ordinarily amenable to black and white solutions. There are many areas of gray in this kind of litigation. Overlaying all of the above is the shifting sand of federal policy which spawns further complicated and knotty difficulties and entanglements. One law review article has characterized Indian policy as having "vacillated between assimilation, annihilation, and self-determination." Note, Recognition of Tribal Decisions in State Courts, 37 Stan.L.Rev. 1397, 1399 (1985).

I wish to further call attention to my concurring in result in *Wells v. Wells*, 451 N.W.2d 402 (S.D.1990).

> As I pen my legal thoughts, a wave of legal concern comes upon my spirit. For over one decade, I have attempted to recognize the Indian community's struggle for social and governmental autonomy, as well as justice for our Red Brothers in this State's courts. *State v. Chief Eagle*, 377 N.W.2d 141 (S.D.1985), Henderson, J., dissenting. Comity and mutual respect to the decisions of tribal courts has been a long time message of mine. *Mexican.* I have in the past, and now, recognize that in South Dakota we

---

**1.** South Dakota has nine Indian Reservations, and each has an active tribal court. Seven have tribal courts which originate in a tribal sovereignty predating the United States Constitution. Two tribal courts are derived from the federally created Courts of Indian Offenses. These tribal courts are all subject to Congressional authority. *See generally* F. Pommersheim, South Dakota

Tribal Court Handbook (March 1988). The Sisseton–Wahpeton Sioux Reservation, formerly the Lake Traverse Indian Reservation, was technically terminated as a "reservation" in 1891, but retains some attributes of reservation status. *See DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

have tribal and state court systems. As found in the 1990 Legislative Senate Journal (pg. 60, 2nd legislative day), our present Governor has declared this year to be a Year of Reconciliation, requesting Indians and non-Indians to come closer together. Our Governor has asked us to set goals, to make strides toward better understanding in 1990. He is quoted in an article on page 2 of the Rapid City Journal, January 12, 1990 as follows: "The end result should not only be fun, but mutual respect and trust." Chairperson, Judy Petersen, who acts as the "Chairman" of the Flandreau Sioux Tribe, observed that the gathering should go beyond pure enjoyment. Governor Mickelson thus appeared before the State Indian Affairs Commission on January 11, 1990 in an attempt to bring together the Indian and white community in a spirit of friendship. *Id.* pg. 1.

On February 1, 1990, Governor Mickelson and representatives of eight of the state's nine Sioux Tribes began what has now been called the "Year of Reconciliation." The Governor sat cross-legged on the floor of our State Capitol rotunda and shared a peace pipe with these Sioux representatives. Filled with legislators, state and tribal officials, the rotunda rang out with traditional Indian songs honoring the Indian people and expressing a hope for peace. *See,* Rapid City Journal, pg. 1, February 2, 1990.

This is the beginning of the second century of South Dakota statehood. It is good that Indians and whites now seek a year of racial understanding and a new beginning of peace with one another.

Alas, but hopefully only for a moment, as the tide of understanding ebbs and flows, South Dakotans read, via a February 3, 1990, Rapid City Journal article that our Governor has said: "We're not going to solve jurisdictional issues." He also expressed that jurisdictional disputes could not be settled by the State and tribes and should not be part of the 1990 Reconciliation effort. Disappointment was expressed by the Chairman of the Cheyenne River Sioux Tribe who observed that the gatherings should go beyond pure enjoyment thereof indicating that: "If he's (the Governor) not interested in jurisdictional things and the issues that are really tearing us apart, there is no sense trying to pull this thing together. It's rhetoric." However, other tribal leaders took a more positive approach after the reconciliation ceremony. Increased understanding by the non-Indians and Indians could bring about help and economic development, health care and education for Indian people, they asserted.

A deep wound exists in the State of South Dakota by virtue of jurisdictional disputes between tribal courts and state courts.[2] The Indians tell us that their inherent sovereignty pre-dates the Constitution of the United States. They want to decide cases, within tribal courts, which involve their people and their children. State court actions which undermine the authority of tribal courts are an impermissible infringement upon the right of tribal self-government. *Williams v. Lee,* 358 U.S. 217, 223, 79 S.Ct. 269, 272 [3 L.Ed.2d 251]. Let us, in the Year of Reconciliation, pursue all avenues of peace to include open-minded solutions to jurisdictional conflict between the Indians and non-Indians of this state.

I wrote specially in *Wells* because I was concerned with the sovereignty of tribal courts. In *Wells,* I called attention to a shining example of how this Court recognized the rights of Native Americans to care for and watch over and protect their own children in their own courts. *In re Guardianship of D.L.L. & C.L.L.,* 291 N.W.2d 278 (S.D.1980). In that special writing, I quoted Federal Judge Bogue as expressing in *Cheyenne River Sioux Tribe v. Kleppe,* 424 F.Supp. 448 (D.S.D.1977):

 ... All too often courts seem to pay little more than lip service to the right and power of Indian people to govern themselves.

---

**2.** This Spotted Horse decision is a tender leaf of hope; let us pray that it blossoms.

Again, in *Wells,* I admonished that Native American people should have jurisdiction over disputes between their own people on their reservations. I quote from my writing:

If state court jurisdiction on Indians or activities on Indian land would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law. The United States Supreme Court in *Iowa Mutual Ins. Co. v. La-Plante et al.,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) declared, inter alia, 'We have repeatedly recognized the Federal Government's long standing policy of encouraging tribal self-government ... Tribal courts play a vital role in tribal self-government (citation omitted), and the Federal Government has consistently encouraged their development.

Further, in *Wells,* I stated:

Land within the limits of any Indian Reservation under jurisdiction of the United States Government is in Indian country. 18 U.S.C. § 1151.

I now note, come the dawn, that the majority opinion now expresses: "Accordingly, South Dakota does not have jurisdiction over Indian country nor may the state exercise partial jurisdiction over highways running through the reservations."

In *Wells,* I stated:

South Dakota has long danced with Public Law 280. It has unsuccessfully attempted to conditionally or partially assume civil and criminal jurisdiction over Indians and Indian territory. *See, In re High Pine,* [78 S.D. 121] 99 N.W.2d 38 (S.D.1959). Said decision overruled Chapter 391 of the Session Laws of 1957 which gave South Dakota criminal and civil jurisdiction over Indian land. Another key decision in this Court is *In re Hankin's Petition,* [80 S.D. 435] 125 N.W.2d 839 (S.D.1964). In *Hankin,* chapter 464 of the Session Laws of 1961 was ruled inconsistent with the congressional purposes of Public Law 280. There has been a historic struggle by the State Legislature with the Congress of the United States to acquire, in one fash-

ion or the other, state jurisdiction to supplant inherent tribal sovereignty. In the end, the Crow Creek Tribe has a right to make and enforce its own laws subject only to the will of Congress. The members of this Court cannot manifest a power, by broad language, to carte blanche assume jurisdiction over controversies between the Indians exclusively arising within the borders of their own reservation. Hearken unto the words of a unanimous United States Supreme Court decision, *United States v. Mazurie,* 419 U.S. 544, 556, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975), reversing a 1973 Tenth Circuit Court decision as found at 487 F.2d 14. Speaking through Justice Rehnquist the highest court of this land stated:

This Court has recognized limits on the authority of Congress to delegate its legislative power ... Those limitations are, less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter ... Thus, it is an important aspect of this case that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory, they are a 'separate people,' possessing 'the power of regulating their internal and social relations ...'

*Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

I wish to point out that this arrest was a reckless arrest and did not justify a 109 mile per hour pursuit, all mind you, arising from an invalid license plate sticker, a class two misdemeanor. This Native American defendant was arrested some 7 to 8 miles within the reservation, on a private driveway (his own). This area was expressly outside the scope of the jurisdictional mandate of SDCL 1-1-21 and SDCL 31-1-1. No action has ever been taken to acquire jurisdiction over a privately owned driveway and yard some 8 miles within the territorial boundary of an Indian Reservation in South Dakota. There are no federal statutes currently authorizing fresh pursuit by state officers onto an Indian Reser-

vation. True, the primary concern of Congress in enacting Public Law 280 was to deal with the problem of lawlessness and the absence of adequate law enforcement on certain reservations. *See, Rosebud Sioux Tribe v. South Dakota,* 709 F.Supp. at 1511. This does not, however, absolve the State of South Dakota from meeting the requirements imposed by federal law to attain such goals.

In *Benally v. Marcum,* 89 N.M. 463, 466, 553 P.2d 1270, 1273 (1976), the New Mexico Supreme Court held that state courts could not try Native Americans who are arrested on a reservation for an off-reservation crime. Perhaps that is good authority for reversing the invalid license plate sticker conviction. However, this Court's analysis is based upon *Winckler,* a contrary viewpoint. So we are standing upon 1977 precedent. Is that precedent sound? Is it sound when one considers the more recent decisions in the federal courts? I full well understand that the majority opinion believes the offense was committed off the reservation and the officer could see the plates. Hence, though an illegal arrest, we can, so the majority says, affirm the verdict on this offense. An arrest such as this should also be the subject of future efforts between Native Americans and the white legal community. It could well be that this arrest is another "gap in criminal jurisdiction." Certainly, this type of scenario is no novelty in South Dakota.

Accordingly, I now welcome the other four members of this Court to my views on reconciliation, *including jurisdiction,* so that Native Americans and the white community can gather in the spirit of giving and understanding which would trigger the elimination of prosecutorial clouds. In the immortal words of Isaiah "Come, let us reason together."

