**UNITED STATES of America, Plaintiff,**

**v.**

**Zane Cameron ZIEGLER, Defendant.**

**No. CR 00–30079.**

United States District Court, D. South Dakota, Central Division.

Feb. 21, 2001.

Randolph J. Seiler, Assistant United States Attorney, Pierre, SD, for Plaintiff.

Edward G. Albright, Assistant Federal Public Defender, Pierre, SD, for Defendant.

## ORDER

KORNMANN, District Judge.

Defendant filed alternative motions to suppress certain evidence or to dismiss the case. U.S. Magistrate Judge Moreno conduced an evidentiary hearing and issued a report and recommendations. Defendant timely served and filed objections (Doc. 26) to the report and recommendations.

This Court has conducted a *de novo* review of the entire file, including the transcript (Doc. 24). The report and recommendation from the magistrate is thorough and detailed, both as to the facts and the applicable law. There is no need to again recite all portions of the document. The evidence was undisputed that this presents a case of "hot pursuit", that the pursuit by the police officer (Tory Engel) from Chamberlain, South Dakota, was witnessed by the tribal officer, including seeing both vehicles traveling at a very high rate of speed, and that the defendant was resisting arrest and was assaulting Marvin Grassrope, a Bureau of Indian Affairs office assigned to the Crow Creek agency and thus, a federal officer. It is also undisputed that officer Grassrope told the defendant outside the house in question that the defendant was "under arrest" and that the defendant attempted to escape into the house. The evidence does go "both ways" as to whether Grassrope saw the defendant throw a beer bottle at the city police officer or, more correctly, at the city police vehicle. Grassrope said he did and Engel thought Grassrope had not yet arrived when that happened. It is undisputed that the defendant, at some point, threw a beer bottle at Engel or Engel's vehicle while outside the house. Such conduct would have been consistent with what had happened during the chase from Chamberlain

when occupants of the truck were throwing beer bottles and cans at the pursuing police car. Grassrope would have known when he arrived and what he saw. Testimony to the contrary by Engel would be largely speculative.

When the defendant tried to enter the house, Grassrope attempted to restrain and take the defendant into physical custody, Grassrope having previously arrested the defendant for tribal charges. Grassrope thought the defendant was still living with the defendant's father (who was also a tribal police officer at one time) and Grassrope did not think the defendant was living at the house in question. Grassrope is a relative (cousin) of the defendant and had previous contacts with the defendant, both on a personal basis and through law enforcement activities. The defendant had no key for the house in question and had been ringing the doorbell seeking entrance for quite some time before a resident of the home suddenly opened the door and the defendant and the officer fell or staggered into the residence. Ringing the doorbell and having no key would be consistent with not living at the house. For all officer Grassrope knew, the defendant would be, unless prevented from doing so, entering someone else's home after 2:00 a.m. while heavily intoxicated and posing a potential threat to the unknown persons in the home. Grassrope had been told that the defendant had already assaulted three people that evening and had been engaged in a high speed chase. There was also probable cause to believe that the defendant was disturbing the peace by shouting repeatedly at Grassrope and Engel under all the circumstances. All the conduct of the defendant was likely in violation of various tribal ordinances, regardless of whether Engel was a police officer. Officer Grassrope acted appropriately and in a lawful manner. Grassrope had the authority to pursue the defendant outside the

residence and into the residence to effectuate the arrest. No rights of the defendant were violated.

The contention of the defendant that no request was made for officer Grassrope to assist is ludicrous. It is totally without merit and should be rejected. As the magistrate observed, it would elevate form over substance.

A citizen contending that an officer has no authority to make an arrest is not permitted to assault the officer or resist arrest unless unlawful force is being brought to bear by the officer. This defendant took the law into his own hands rather than submit to the arrest and challenge it later in a court of law. Such is not to be permitted, especially under the facts of this case.

The motions to suppress or to dismiss (Doc. 16) should be denied. The report and recommendation should be adopted and the objections of the defendant should be overruled.

Now, therefore,

IT IS ORDERED:

1) The report and recommendation (Doc. 25) is adopted.

2) The objections of the defendant (Doc. 26) are overruled.

3) The motion to suppress and the motion to dismiss (Doc. 16) are denied.

REPORT AND RECOMMENDATIONS FOR DISPOSITION OF DEFENDANT'S MOTIONS TO SUPPRESS AND TO DISMISS

MORENO, United States Magistrate Judge.

## I.

[¶ 1] Defendant, Zane Cameron Ziegler, ("Ziegler") filed alternative Motions to Suppress Evidence and to Dismiss on December 18, 2000. A hearing on the Motions was later held on January 25, 2001 in accordance with the District Court's [1] Order requiring that all motions, other than motions in limine and for continuance, be heard by this Court. Because Ziegler's Motions are dispositive ones, the Court is only authorized to determine them on a report and recommendation basis. Pursuant to 28 U.S.C. § 636(b)(1), the Court does now make and propose the following report and recommendations for disposition of Ziegler's Motions.

## II.

[¶ 2] Ziegler is charged by indictment, filed on November 15, 2000, with assaulting, resisting or impeding a federal officer in violation of 18 U.S.C. § 111. Ziegler has pled not guilty to the charge in the indictment and is currently out on bond.

[¶ 3] In his suppression motion, Ziegler seeks to exclude "any and all testimony or evidence" derived from his September 19, 2000 arrest. Alternatively, Ziegler has moved to dismiss, alleging that his arrest was illegal and that the officer who arrested him had no authority to do so.

[¶ 4] Upon review of the Motions and after consultation with counsel, the Court scheduled a hearing on the same. At the hearing, six witnesses testified and four exhibits were received into evidence. The Court thereafter took the matter under advisement.

## III.

[¶ 5] A few minutes after 2:00 a.m. on September 19, 2000, Tory Engel, a police officer for the City of Chamberlain, South Dakota, was advised by his dispatcher that there was a fight at the Silver Dollar Bar in Chamberlain. Engel responded to the call and headed toward the bar. As he

1. The Honorable Charles B. Kornmann, United States District Judge, presiding.

approached the bar, he saw a crowd of people around a white pickup truck parked in front of the bar. When Engel turned his emergency lights on, the white truck took off. Engel pulled up to the crowd and was told that the person in the truck had assaulted three people. Engel could see that there were two people in the truck and started in pursuit of it. He followed the truck north on Highway 50 toward the Crow Creek Reservation at speeds in excess of ninety miles an hour. Engel's dispatcher advised the Fort Thompson, South Dakota Police Department ("FTPD") of the pursuit and asked for assistance. FTPD offered to have one of its officers lay down spike strips in an effort to stop the truck. During the chase, the truck occupants threw beer bottles and cans at Engel's patrol car. A short time later, the two vehicles entered the Crow Creek Reservation.

[¶ 6] In the meantime, Marvin Grassrope, a Bureau of Indian Affairs ("BIA") officer assigned to the Crow Creek Agency, was informed of the pursuit and requested to assist the Chamberlain officer. When Grassrope learned that the pursuit had continued on into the Reservation, he headed toward the junction of Highways 50 and 34 to lay road spikes in an effort to disable the truck. Grassrope, however, arrived too late but did manage to see the two vehicles pass by him. He then proceeded to "Lee's Corner", hoping to intercept the truck with road spikes again, but the truck turned into the Bad Nation Housing area and parked next to a residence there.[2]

[¶ 7] According to Engel, Ziegler got out of the truck, threw a beer bottle at Engel and then picked up a shovel and waved it around. Engel drew his weapon and point-

ed it at Ziegler, demanding that he put the shovel down. Eventually, Ziegler dropped the shovel. While this confrontation ensued, Ziegler shouted profanities at Engel. Fearing for his safety, Engel called his dispatcher and asked for backup right away. A minute or so later, Engel reported that Grassrope arrived, got out of his patrol car and began to approach Ziegler and tell him to calm down. Ziegler, who by now was at the side door to the house, refused to cooperative and tried to open the door but it was locked. Grassrope, followed by and with the help of Engel, attempted to handcuff Ziegler, but he physically resisted. As the men struggled, someone from inside the house opened the door and all three of them tumbled into the entryway. Engel remembers Grassrope placing Ziegler under arrest, but does not know whether he did so in or outside of the residence.

[¶ 8] Grassrope's version of what transpired is somewhat different than Engel's. Grassrope testified that he was monitoring radio traffic about two or three miles outside the Housing area when he heard Engel's request for immediate assistance and responded to it. Upon arriving at the residence, Grassrope observed Ziegler, who he recognized,[3] walk toward Engel, throw a beer bottle and swear at him. When he saw Grassrope's patrol car, Ziegler started walking toward the side door of the residence. Grassrope then got out of his vehicle, advanced in the direction of Ziegler, told him he was under arrest and tried to grab him by the arm. Ziegler, who was standing on the side deck at this time, began to push on the door in an attempt to get it open. The door then popped open (whether Grassrope or some-

---

2. Curiously, the record does not indicate who the other person in the truck was (if in fact there was another person) or what ever happened to this person after the stop.

3. Grassrope and Ziegler are cousins.

one else did this is unclear). In response, Grassrope grabbed hold of Ziegler's arm and fell with Ziegler into the house. Once inside, Ziegler began pulling away and tried to crawl further into the house. Engel quickly arrived to assist Grassrope and scuffled with Ziegler. While on the floor of the house, Ziegler punched Grassrope in the temple and continued to resist. It was not until Ziegler was maced and a third officer arrived that Ziegler was finally able to be restrained and handcuffed. Ziegler, however, would not settle down and kicked off part of the door handle after being placed in Grassrope's vehicle.[4]

## IV.

[¶ 9] Ziegler first contends that "Grassrope had no legal authority to arrest him." In citing *State v. Spotted Horse*, 462 N.W.2d 463 (S.D.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991), he points out that had Engel arrested him at his house for the state offenses, the arrest would have been illegal.[5] He likewise maintains that Grassrope had no authority to arrest him for the state offenses because they were misdemeanors that did not occur in Grassrope's presence and because the arrest was made without probable cause.

[¶ 10] It must be remembered that Grassrope arrested Ziegler on tribal charges[6],

and not for violating state law. The tribal charges were all for offenses that were committed in Grassrope's presence and were based on what he saw, heard and experienced that night. This being the case, Grassrope had both the statutory authority and the requisite probable cause to arrest Ziegler for tribal law violations. *See* 25 U.S.C. § 2803(3)(A);[7] *see generally*, 2 W. LaFave, *Search and Seizure*, §§ 3.1, 3.2, 3.5, 3.6 (3d ed. 1996 & 2001 Supp.).

[¶ 11] In reaching this conclusion, the Court has weighed and considered the alleged contradictions in Grassrope's and Engel's testimony including and especially, the renditions given by them of the beer bottle incident that occurred outside of Ziegler's residence. Grassrope testified that he saw Ziegler throw a beer bottle at Engel as Grassrope was approaching the residence. Engel, on the other hand, maintained that Grassrope had not arrived or at least was not in the driveway to the residence when the bottle was thrown. The Court, crediting Grassrope's testimony, believes that he did in fact see Ziegler hurl a partially full beer bottle toward Engel. It is important to bear in mind that Engel was a rookie police officer in his early twenties, who at the time had not received his law enforcement certification, was face-to-face in hostile territory with a

---

4. Ziegler's wife provided a third version of the events that night but she was not, in the Court's view, a credible witness.

5. It should be mentioned, however, that because these offenses were committed off the Reservation and corroborated by independent evidence obtained through Engel's observations before the arrest, the State would not be barred from prosecuting Ziegler in State court, notwithstanding the manner and even the propriety of his arrest on the Reservation. *Spotted Horse*, 462 N.W.2d at 469; *see also, United States v. Patch*, 114 F.3d 131, 134 (9th Cir.), *cert. denied*, 522 U.S. 983, 118 S.Ct. 445, 139 L.Ed.2d 381 (1997).

6. When Grassrope initially told Ziegler that he was under arrest, Grassrope intended only to arrest Ziegler for violence to a police officer and disorderly conduct. As a result of his subsequent actions and conduct, Ziegler was ultimately arrested on these two offenses and three more, namely, eluding and resisting a police officer and injuring public property.

7. This section of the Indian Law Enforcement Reform Act, 25 U.S.C. §§ 2801–09, was passed by Congress in 1990 and authorizes a BIA officer to "make an arrest without a warrant for an offense committed in Indian country if the offense is committed in the presence of the [officer]."

man suspected of assaulting three people and was admittedly frightened, telling his dispatcher that he needed "someone here now". Against this backdrop, it is easy to understand how and why Engel's chronological perceptions might be skewed or affected in some manner, especially with regard to events (such as Grassrope's arrival and observations at the scene) that took place behind where Engel was situated and at a time when he was focused on a suspect who was belligerent and screaming obscenities at him. Given Engel's vantage point and the situation he faced, it would have been difficult for him to pinpoint exactly when in the scheme of things Grassrope arrived or, for that matter, what Grassrope himself saw as he pulled up to the residence.

## V.

[¶ 12] In an interrelated argument, Ziegler asserts that his arrest was unlawful because Grassrope did not have the authority under 25 U.S.C. § 2803(8)[8] to arrest him for the state offenses. In particular, Ziegler argues that Grassrope was never "requested" by Engel to assist in the enforcement of state laws, (i.e., the pursuit and capture of Ziegler for assault, eluding and related state charges). Again, it bears repeating, that Grassrope arrested Ziegler for tribal offenses Grassrope himself witnessed and had probable cause to believe had occurred. Yet, even assuming otherwise, the record plainly indicates that Grassrope was requested by state law enforcement officials to assist in the stop and apprehension (and, if need be, arrest) of Ziegler.

[¶ 13] To trigger the authority granted by § 2803(8), there must be some kind of "request", made by a state/local agency, for assistance from a BIA officer on a criminal or regulatory matter which the agency has jurisdiction over. In determining whether assistance has been "requested", as contemplated by the statute, radio traffic and communication between the parties must be examined in light of law enforcement parlance and customs and the circumstances present. Form should not be vaulted over substance and the absence of certain terminology should not dictate or, more importantly, trump the overall meaning of the message(s) intended to be conveyed. If, after review of the entirety of the situation, the court is left with a definite and firm conviction that a BIA officer has been asked to provide a state/local agency with law enforcement assistance on a matter the agency is charged with administering or enforcing, the officer is clothed with the necessary authority, under the statute, to act and render aid.

[¶ 14] Regardless of what was actually said in communications with FTPD, the clear import of Engel's and his dispatcher's messages was to seek and obtain the assistance right away from BIA officers with a fleeing suspect, headed toward the Crow Creek Reservation at a high rate of speed, who was believed to have assaulted three individuals and was eluding capture. To require that an agency use, when asking for help from BIA authorities, the words "request" and "assist", or derivatives thereof, is too rigid a requirement and

---

8. This provision reads as follows:

The Secretary may charge employees of the Bureau [of Indian Affairs] with responsibilities and may authorize those employees to—-

    \*    \*    \*    \*    \*    \*

(8) when requested, assist (with or without reimbursement) any Federal, tribal, State, or local law enforcement agency in the enforcement or carrying out of the laws or regulations the Agency enforces or administers.

would serve to chill cooperation among and between federal, state, local and tribal agencies and strip, rather than augment, the authority needed by BIA officers to serve and protect the public.

[¶ 15] Grassrope here had the authority, *vis a vis* § 2803(8) to assist Engel in collaring and ultimately arresting Ziegler for state law violations, and under § 2803(3)(A), to arrest Ziegler himself for those tribal offenses committed in his presence. Consequently, Ziegler's "unauthorized" arrest argument is groundless and cannot provide him with a basis for relief.

## VI.

[¶ 16] Ziegler next claims that his Fourth Amendment rights were violated when he was arrested, without a warrant, at or near the side doorway to his residence. He maintains that any and all evidence derived from his warrantless arrest is tainted and must be suppressed under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

[¶ 17] Generally, police may not enter a home to arrest a person without an arrest warrant, unless exigent circumstances exist. *Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also, Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). The Fourth Amendment provides a reasonable expectation of privacy in a variety of settings but the "chief evil" against which the Amendment is directed is the "physical entry of the home." *Welsh,* 466 U.S. at 748, 104 S.Ct. 2091 (*quoting United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). "In [no setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home ...." *Payton,* 445 U.S. at 589, 100 S.Ct. 1371.

As the Court held in *Payton,* the Fourth Amendment draws "a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. 1371.

[¶ 18] Four years before deciding *Payton,* however, the Supreme Court determined in *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), that police could arrest a person who was standing in the doorway to her home because the doorway was open and therefore was a public place. In *Santana,* police saw defendant in the doorway of her house shortly after a heroin transaction they had probable cause to believe she participated in. The police pulled their van up near her home, got out, identified themselves as policemen and approached defendant to arrest her. Defendant fled into her home. The police followed her through the door to the residence, catching her in the vestibule, where she was arrested.

[¶ 19] The Supreme Court dismissed defendant's Fourth Amendment challenge and upheld the arrest. First, the Court found that defendant had no reasonable expectation of privacy standing in her own open doorway: "She was not merely visible to the public but was as exposed to public view, speech, hearing and touch as if she had been standing completely outside her house." 427 U.S. at 42, 96 S.Ct. 2406. The Court, therefore, concluded that the police could arrest defendant in her doorway under its earlier decision in *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), that police with probable cause may arrest a person in a public place without a warrant. *Id.*

[¶ 20] Nevertheless, the police were not actually able to complete defendant's arrest in her doorway; they had to enter her home to bring her under their control. 427 U.S. at 40, 96 S.Ct. 2406. Even so, the

Supreme Court sustained the arrest in the home, not because the home was a public place, but because defendant could not thwart an arrest begun in a public place (her own open doorway) by escaping into her house. *Id.* at 42–43, 96 S.Ct. 2406. According to the Court, entry into defendant's home was justified by the exigent circumstance of "hot pursuit". *See id.*

[¶ 21] More recently, the Supreme Court reaffirmed that "hot pursuit" of a fleeing suspect could be considered an exigent circumstance. *See Olson,* 495 U.S. at 100–01, 110 S.Ct. 1684. In addition to "hot pursuit", the Court indicated that a warrantless entry into a residence could also be justified by the imminent destruction of evidence, the need to prevent a suspect's escape, and/or the risk of danger to the police or to other persons inside or outside the dwelling. *Olson,* 495 U.S. at 100, 110 S.Ct. 1684; *see also, Rogers v. Carter,* 133 F.3d 1114, 1119 (8th Cir.1998) ("[t]he warrant requirement is suspended when— in the press of circumstances beyond a police officer's control— lives are threatened, a suspect's escape looms, or evidence is about to be destroyed"), (*quoting United States v. Duchi,* 906 F.2d 1278, 1282 (8th Cir.1990)).

## A.

[¶ 22] In the instant case, the circumstances known to Grassrope were exigent enough to allow for a warrantless home arrest. Contrary to Ziegler's assertions, this *is* a hot pursuit case and is governed by *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), *Santana* and their progeny. *See United States v. Jones,* 204 F.3d 541, 542–43 (4th Cir.2000) ("hot pursuit" doctrine applies here, where officer observed defendant place small plastic bag, which contained white powder,

in his mouth, ordered him to stop, at which time defendant ran into house and locked the door). From approximately 2:06 a.m. until 2:32 a.m., Grassrope was involved in the pursuit and apprehension of Ziegler. Grassrope listened to the radio traffic between Engel and his dispatcher and was aware of the events that transpired during the chase. He attempted, on two separate occasions, to lay road spikes down in an effort to stop Ziegler, but was seconds too late both times. When he heard Engel's plea for help on the radio, Grassrope hurriedly sped to the residence where Engel had stopped. There, he saw Ziegler throw a beer bottle at Engel and then move toward and scream at the officer. Upon seeing Grassrope arrive, Ziegler began to retreat toward the side door of the house. Immediately thereafter, Grassrope proceeded toward Ziegler and told Ziegler that he was under arrest. When Ziegler refused to cooperate, an affray broke out at the side door and continued on into the entryway of the house before Ziegler was maced and handcuffed. Ziegler had allegedly assaulted three individuals thirty minutes earlier, had taken police on a high-speed chase for several miles in an effort to elude them, had thrown beer bottles at an officer during the pursuit and had threatened and resisted officers in and outside his residence.

[¶ 23] Given the situation present, Grassrope acted reasonably when he arrested Ziegler on tribal charges. Not only did Grassrope play an active role in the pursuit of Ziegler, he also helped thwart Ziegler's escape attempt, prevented a potentially deadly confrontation with Engel and vitiated any danger to persons both in and outside of the dwelling.[9] Speed here was essential and only through quick action was the encounter over a short time after

---

9. Testimony at the suppression hearing revealed that Ziegler's wife (who was at or immediately adjacent to the doorway in question), her grandmother, her aunt and two young children were in the house at the time of the arrest.

it began. In view of the "hot pursuit" of Ziegler, which Grassrope was an integral part of, and the exigencies present, Grassrope's warrantless doorstep arrest of Ziegler was not inconsistent with nor in violation of the Fourth Amendment.

## B.

[¶ 24] This Court need not tarry over Ziegler's exact location in relation to the doorway at the time of his arrest. *See Duncan v. Storie*, 869 F.2d 1100, 1102 (8th Cir.), *cert. denied*, 493 U.S. 852, 110 S.Ct. 152, 107 L.Ed.2d 110 (1989). Courts should not be required to sort out "metaphysical subtleties", such as whether the suspect was "in" the doorway rather than "at" it, or "on" the threshold rather than "by" it.[10] As *Santana, Watson* and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) illustrate, the crucial issues involve a suspect's reasonable expectation of privacy and the voluntariness of his presence in the doorway area. *Storie*, 869 F.2d at 1102.

■■ [¶ 25] Here, Ziegler was in the process of retreating to the door and attempting to gain entry through it when he was arrested. He thus was not in a place where he had an expectation of privacy. Nor had he been summoned to the door[11], but rather, was in the threshold area voluntarily. It was not until Grassrope arrested him that Ziegler attempted to enter through the doorway and take refuge in the residence. Under these circumstances[12], given what he had witnessed and dealt with, Grassrope was within his authority to pursue Ziegler at, on and even past the threshold to effectuate his arrest. *See United States v. Ball*, 90 F.3d 260, 263–64 (8th Cir.1996); *United States v. Reed*, 733 F.2d 492, 502–04 (8th Cir.1984); *see also, State v. Henning*, 975 S.W.2d 290 (Tenn.1998) (where officer approached defendant to arrest him outside his residence and defendant subsequently fled to residence, with officer seizing him when he was entering and both then falling into the doorway, the warrantless entry and arrest were proper); *see generally*, 3 LaFave, § 6.1(d), n. 123; *compare Carter*, 133 F.3d at 1119 (warrantless home arrest not based on or supported by exigent circumstances because defendant was not a suspect whose escape was imminent or a threat to anyone at the time and because the municipal disorderly conduct offense was an "extremely minor" one).

## VII.

■ [¶ 26] In the alternative, Ziegler moves for a dismissal of the indictment, alleging that "Grassrope was not acting in [an] official capacity as a federal officer at the time [of the arrest]". Ziegler claims that Grassrope was not an officer or em-

**10.** In *Santana,* the Supreme Court emphasized that defendant, because she was standing in the open doorway of her home when police arrived and identified themselves, was in a "public" place. 427 U.S. at 40, 42, 96 S.Ct. 2406. It stands to reason then that a person who stands just inside an open door is likewise in a "public" place. Similarly, what about a police officer who reaches into a doorway when making a warrantless arrest and thereby breaks the vertical plane of the threshold; is this arrest unlawful? Should the legality of doorway arrests be determined by "resort to plumbob and quaint distinctions" drawn from the "entry" element of a burglary offense? *See* 3 LaFave, § 6.1(e) at p. 258.

**11.** *Compare, United States. v. Conner,* 127 F.3d 663, 666 (8th Cir.1997).

**12.** In doorway arrest situations, courts look at whether there was deliberate delay, coercive behavior, deceptive practices or some egregious police misconduct in the course of the arrest. *See United States v. Davis,* 785 F.2d 610, 615 (8th Cir.1986); *see also, United States v. Vaneaton,* 49 F.3d 1423, 1426–27 (9th Cir.1995), *cert. denied,* 516 U.S. 1176, 116 S.Ct. 1271, 134 L.Ed.2d 218 (1996). No such circumstances are present in this case.

ployee of the United States, who was engaged in the performance of his official duties, within the meaning of 18 U.S.C. § 1114, when the arrest took place. According to Ziegler, Grassrope's actions— grabbing Ziegler and telling him he was under arrest— were conduct that Grassrope engaged in on his own and without law enforcement authority.

[¶ 27] Ziegler's claim is foreclosed by several recent South Dakota cases decided by the Eighth Circuit. *See United States v. Young,* 85 F.3d 334 (8th Cir.1996); *United States v. Bettelyoun,* 16 F.3d 850 (8th Cir. 1994); *United States v. Oakie,* 12 F.3d 1436 (8th Cir.1993); *United States v. Schrader,* 10 F.3d 1345 (8th Cir.1993). In these decisions, the Appeals Court made clear that BIA officers were "federal officers" for purposes of 18 U.S.C. § 111 if, when they encountered a defendant, they were engaged in law enforcement functions. *Young,* 85 F.3d at 335; *Bettelyoun,* 16 F.3d at 852–53 & n. 2; *Oakie,* 12 F.3d at 1439–40 & n. 2; *Schrader,* 10 F.3d at 1350. The record unequivocally shows that at all times relevant to this controversy, Grassrope was engaged in the performance of his official duties, enforcing, or assisting in the enforcement of, tribal and/or state laws. His actions and conduct were not *ultra vires* or "a personal frolic of his own". *See Bettelyoun,* 16 F.3d at 852; *Schrader,* 10 F.3d at 1350–51. "He [was] thus a 'federal officer' within the meaning of [ ] § 111 by the express words of 28 U.S.C. § 2804(f)." *Young,* 85 F.3d at 335; *see also, Bettelyoun,* 16 F.3d at 852 ("a BIA officer ... is obviously a federal officer for purposes of § 111"). Accordingly, Ziegler's Motion to Dismiss is wholly without merit and must be denied.

## VIII.

[¶ 28] Based on the foregoing and in accordance with 28 U.S.C. § 636(b)(1), the Court concludes that Ziegler's arrest was made within the bounds of Grassrope's authority as a federal officer and did not violate the Fourth Amendment. As such, the Court RECOMMENDS that Ziegler's alternative Motions to Suppress and to Dismiss, Docket No. 16, be DENIED in all respects.

[¶ 29] Dated this 6th day of February, 2001, at Pierre, South Dakota.

### NOTICE

Failure to file written objections to the within and foregoing Report and Recommendations within ten days from the date of service shall bar the aggrieved party from attacking the Report and Recommendations before the assigned United States District Judge. *See* 28 U.S.C. § 636(b)(1).